(No. 13584.—Decree affirmed.)
James H. Cook *et al.* Appellees, *vs.* John M. Wolf *et al.*—
(Belle D. Wolf, Appellant.)

*Opinion filed December 21, 1920—Rehearing denied Feb. 4, 1921.*

1. Deeds—*when decree setting aside deed and stating account will not be disturbed.* A decree setting aside a deed and stating an account will not be reversed on the ground that it is not supported by the evidence unless the Supreme Court is able to say that the decree is palpably contrary to the weight of the testimony.

2. Lis pendens—*purchasers pendente lite take subject to the decree.* Where a suit is pending to set aside a deed, purchasers from the grantee acquire no rights superior to those of the grantee but their interest is subject to the decree and may be made subordinate to the prior rights of the complainant.

3. Duress—*when conveyance by a debtor may be avoided on the ground of duress.* Where the action of a creditor is oppressive and unconscionable and intended to coerce a debtor without funds or resources to convey his property for a grossly inadequate consideration, a court of equity will not consider the consent thus obtained as sufficient to fix the rights of the parties and the conveyance may be set aside.

4. Same—*equity will consider character and situation of person influenced in determining question of duress.* A court of chancery, in determining whether an act can be avoided on the ground that it was performed under conditions which deprived the person acting of that free exercise of the mind essential to a valid contract will consider the character and situation of the person influenced.

5. Accounting—*when debtor will be allowed credit for usurious interest paid by him.* Where a usurious debt has been paid off and discharged the debtor has no right to sue and recover the usury paid, but on a bill for accounting involving a continued or connected course of business, consisting of many notes upon which usurious interest has been paid for extensions and renewals, the debtor is entitled to have all usurious interest paid by him credited on the indebtedness resulting, in whole or in part, from such prior dealings.

Appeal from the Circuit Court of Moultrie county; the Hon. W. K. Whitfield, Judge, presiding.

W. R. Huff, and Ray D. Meeker, for appellant.

M. A. MATTOX, and MILLER & PATTERSON, for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

Appellees, James H. Cook and Corda M. Cook, his wife, filed their bill in the circuit court of Moultrie county May 7, 1915, against John M. Wolf, Belle D. Wolf, his wife, and others, to set aside and cancel a deed to Belle D. Wolf, to cancel certain chattel mortgages and for an accounting. After a hearing on exceptions to the report of a special master in chancery, to whom the cause was referred after issue joined, the chancellor, after modifying the statement of the account in respect to some items, overruled the exceptions of defendants and entered a decree in favor of complainants, appellees here, from which decree this appeal is prosecuted.

James H. Cook at the times of the transactions involved in this litigation was a farmer and Corda M. Cook was his wife. Cook owned and he and his wife lived on a tract of farm land containing 16.07 acres adjoining the corporate limits of the city of Sullivan. The land was fertile, valuable land and was well improved. John M. Wolf resided in Sullivan and was engaged in loaning money on chattel mortgage security. Belle D. Wolf is his wife. The bill is very lengthy, covering more than thirty pages of the abstract, and we will attempt to state sufficient of the material averments to get an understanding of the material questions raised and decided.

The bill avers, in substance, that March 9, 1911, Cook borrowed of Wolf $280 and gave his note bearing seven per cent interest and secured by chattel mortgage for $390, due September 1, 1911. When that note became due it was not paid but was renewed and the time of payment extended to February 1, 1912, and Cook gave his note, secured by chattel mortgage, for $498.60, the note to draw seven per cent interest, but Cook received no money on the note.

February 1, 1912, Cook again renewed to Wolf, giving his note for $605 and securing it by mortgage on his land. Cook received no money at this time, the loan representing the original loan of $280 and $110 usury and unlawful commission included in the first renewal, $108.60 usury and unlawful commission included in the second renewal, and $106.40 usury and unlawful commission included in the third. February 29, 1912, Cook borrowed of Wolf $180 but gave his note for $260, secured by chattel mortgage, $80 of which was usury and unlawful commission. April 29, 1912, Cook borrowed from Wolf $125 and gave his note, secured by chattel mortgage, for $195, $70 of which was usury and unlawful commission. February 14, 1913, Cook borrowed from Wolf $200 and gave his note for $260, secured by chattel mortgage, $60 of which was usury and unlawful commission. July 1, 1913, Cook gave Wolf a note for $270, secured by chattel mortgage, but the bill avers it was given in lieu of and as an extension of previous mortgages, and Cook received no money from Wolf on that note and chattel mortgage. It is not alleged there was any additional usury added to that note. January 2, 1914, Cook gave Wolf another note for $509.45, which was a renewal and extension of all loans on chattel mortgages up to that time. The bill alleges Cook paid Wolf on May 12, 1913, on the chattel mortgage indebtedness $265.15, on February 14, 1913, $4.50, and on September 16, 1911, $30.60, making a total of $300.25, and leaving a balance unpaid of $494.75. January 3, 1913, Cook and wife gave Wolf a mortgage on their land for $1526.76, which amount included all the chattel mortgage indebtedness and the amount for which the previous real estate mortgage was given, but Cook received no further money from Wolf, except Wolf paid two judgments against Cook, one for $86.61 and another for $65.02. In addition to the money actually furnished Cook by Wolf the real estate mortgage included usury and unlawful commissions.

When the note secured by the real estate mortgage became due by its terms, Wolf required the Cooks to give him another mortgage on the land to secure a note for $2332.06 in renewal of all previous real estate and chattel mortgages, and the bill alleges it was in full of all previous indebtedness between the parties and was so expressly declared by Wolf and accepted by him as such, but after the mortgage was executed Wolf claimed there was due him on one of the chattel mortgages $172.50, which he was going to hold as collateral security, and he refused to surrender the same.

The bill further alleges the Cooks had given a first mortgage on their land to John N. Mattox to secure $2000, and in the summer of 1914 Mattox filed a bill to foreclose the mortgage, and at the September term, 1914, of the court obtained a decree for foreclosure and sale of the property. The sale was made January 5, 1915, and the property was purchased by Mattox for the debt and costs, amounting to $2578.67. Wolf made frequent visits to the Cooks and had frequent talks with them about said foreclosure proceedings, and arranged with them to procure a new loan on the land to take up all previous indebtedness, but no new loan was secured. The Cooks are not educated in matters pertaining to court procedure and consulted no attorney with reference to the matter of foreclosure but consulted only with Wolf, who represented he knew all about such matters and represented to the Cooks that the decree provided for a receiver of the land, who would take possession until the expiration of the period of redemption and large amounts of costs and expenses would be charged against them; that the Cooks would lose their land because it was not sufficient to pay Mattox and the indebtedness to Wolf; that he could not afford to lose his money; that he purposed to collect all the notes called for; that it was a lawful and legitimate debt; that he would take a judgment over against Cook, and if he ever inherited any property Wolf would collect the judgment; that Wolf requested the

Cooks to make him a deed to the land, claiming they owed him $2332.06, with seven per cent interest from date, also $172.50 on a chattel mortgage; that the Cooks did not want to make him a deed, but Wolf persisted and finally brought a notary public to their home with a deed prepared, insisted that they execute it, and threatened to take possession of the land under his mortgage, foreclose the chattel mortgage and take all the property they had; that finally, the Cooks believing what Wolf told them and having no money or property to satisfy the claims and believing themselves to be completely at the mercy of Wolf, on December 2, 1914, executed a deed to Wolf's wife, Belle D. Wolf; that they were induced to execute the deed by the threats of Wolf to take all of their property and turn them out of their home without anything. The deed was dated October 21, 1914, but was executed December 2. Wolf agreed to pay off the Mattox mortgage and prevent a sale under the foreclosure decree and thereby save an additional sum of costs. Mrs. Cook repeatedly asked Wolf what all the supposed indebtedness was for and expressed her surprise that it should be so large a sum. Wolf assured her it was for money actually loaned her husband, was a *bona fide* and legitimate indebtedness, and that he could and would collect every cent of it. The representations of Wolf that a receiver would take possession of the property under the Mattox mortgage and take the crops on the land were false and known by him to be false at the time and were made for the purpose of inducing the Cooks to execute the deed; that the representations made by him as to the amount of money he had furnished Cook were false and known to him to be false. Numerous other representations set out were alleged to be false and known to be false, and were made for the purpose of coercing and intimidating the Cooks, to enable Wolf to collect a large amount of usurious interest and an unlawful commission. After being thus induced to make the deed the Cooks learned Wolf did not own the

$2332.06 mortgage but it was owned and held by George A. Sentel, one of the defendants to the bill.

The bill further alleges Wolf took possession of the land March 1, 1915, and has ever since occupied it by a tenant; that the rental value of the land is $10 or $15 per acre per annum. The bill charges that Wolf is trying to sell the land; that the equity of redemption is worth $2500 or $3000; that the Cooks did not owe Wolf any amount approximately near $2332.06; that the aggregate of all the money Wolf loaned Cook was about $795, in addition to the judgments paid by Wolf; and the amount of indebtedness to Wolf after deducting payments is $671.38. The bill further alleges that May 1, 1915, Wolf by his agent took possession of the personal property described in a chattel mortgage for the purpose of foreclosing same and Cook replevined the same before a justice of the peace, which suit was pending when the bill was filed. Wolf failed to pay off the Mattox foreclosure, as he agreed to, and allowed the property to be sold January 5, 1915. The bill prayed for an accounting; that Wolf be enjoined from foreclosing his chattel mortgage; that he and Belle D. Wolf be enjoined from selling or encumbering the land; that the Cooks be decreed to pay Wolf the amount found due him on an accounting; that the deed to Belle D. Wolf be set aside; that the $2332.06 mortgage be canceled and the chattel mortgage sought to be foreclosed be held null and void.

The answer of Wolf denied there was any usury or unlawful commission in any of the chattel mortgages executed by Cook; avers the chattel mortgage executed January 2, 1914, was to secure all previous mortgage indebtedness, which then amounted to $549.05 and represented money actually loaned Cook, and no part of it was usurious interest or unlawful commission. The answer avers that the $2332.06 real estate mortgage embraced the indebtedness secured by the former real estate mortgage and

the interest and additional loans made to Cook; that it was a settlement, and no part of it was usurious interest or unlawful commission. The answer denies Wolf made frequent visits to the Cooks and advised them as to the law in foreclosure matters or requested them to make the deed, but avers he told the Cooks he did not want the land but wanted the money due him, and the Cooks after full discussion, on their own motion and without any false statements, coercion or intimidation, made the deed to Belle D. Wolf. The answer avers the Cooks knew Sentel furnished the money for the loans to Cook, that the mortgages belonged to him, and that Belle D. Wolf had paid Sentel $2440 for the $2332.06 real estate mortgage and was the owner of it. The answer further avers that at the time the deed was made the Cooks agreed to pay Wolf $172.50 secured by chattel mortgage, and afterwards, on their refusal to do so, he took possession of the property for the purpose of foreclosing the chattel mortgage, and subsequently the father of Cook paid Wolf $150 in settlement of the chattel mortgage and he released the same. Belle D. Wolf denies she had any knowledge of the chattel mortgages or the first two real estate mortgages, and denies all charges of collusion in the bill and alleges she is a purchaser for value.

This outline of the substantial facts alleged and denied in a very lengthy bill and answer we deem sufficient to show what the issues made by the pleadings were.

At the September term, 1915, the cause was referred to the then master in chancery, E. D. Elder, to take all the evidence and report his conclusions of law and fact. Evidence of both parties appears to have been heard by the master in December, 1915, but no report was made by him and no further steps taken in the case till the September term, 1917, when defendants moved to dismiss the bill for want of prosecution, which motion was denied. The injunction granted restraining John M. and Belle D. Wolf

from selling or encumbering the land was modified in 1915 by permitting them to redeem from the Mattox foreclosure sale. At the September term, 1919, Elder's term as master in chancery having expired, the cause was re-referred to him as special master to report the evidence formerly taken and his conclusions. Further evidence was taken before the special master in December, 1919. The master reported his conclusions, finding complainants were entitled to the relief prayed in the bill and recommending a decree setting aside the deed to Belle D. Wolf. Exceptions by defendants were overruled by the chancellor except as to certain items in the statement of the account. On the final hearing the court found and decreed that the aggregate of all the money actually loaned to Cook by Wolf was $1186.61, upon which Cook had paid $575.25, and at the time the deed was made by the Cooks to Belle D. Wolf Cook owed Wolf $611.36; that the land was then worth approximately $400 per acre; that the amount required to redeem from the Mattox foreclosure sale was approximately $2500 and the value of the equity in the land was $4000. After a further reference to the special master for further testimony on the accounting the cause again came before the court on exceptions, and as finally modified by the decree Cook was charged with the balance of all money actually borrowed by him from Wolf, the amount Wolf paid to redeem from the Mattox foreclosure sale and the taxes paid by Wolf on the land, and, giving Wolf credit for taxes paid and the Mattox redemption, the total amount found due from Cook to Wolf was $2190.56. The court set aside the deed on the ground that the circumstances under which it was executed amounted to equitable duress. The amount found due from Cook ($2190.56) was decreed to be paid by him with interest at six per cent per annum and was made a lien against the land. The decree set aside the deed as to all persons claiming by, through or under defendants since the commencement of the suit, and pos-

session of the land was ordered delivered to complainants. Belle D. Wolf prosecutes this appeal.

It is objected that the court erred in overruling defendants' exceptions to and their motion to suppress the master's report for misconduct of the master. When the case was before the master on a re-reference to more specifically state the account and ascertain the exact amount of money that went into the second and third real estate mortgages, with leave to the parties to present other evidence that would have a bearing on that branch of the case, the master, it is claimed, permitted complainants to introduce other evidence having no bearing on that question. The first order of reference to the master contained the direction that all evidence be heard by December 20, 1915. On re-reference the master, over defendants' objections, permitted the introduction of the deed from the Cooks to Belle D. Wolf, a deed from Belle D. Wolf to U. S. Wolf and Elvis Golden to the same land, made while the suit was pending and after she had been enjoined from conveying it, and proof as to the value of the land. These were all material matters intimately related to the stating of the account, and we do not think hearing the testimony was such misconduct as would justify reversing the decree and sending the case back, to go over the matter again at great expense to the parties.

The testimony on the merits of the controversy as to the facts is highly conflicting. The most material evidence on those questions was the testimony of Cook and his wife on one side and Wolf and his wife on the other side. Neither Mrs. Cook nor Mrs. Wolf had any knowledge of the chattel mortgage transactions and as to how much money Wolf had in fact loaned Cook. Upon that question Wolf and Cook were the two witnesses who knew the truth of those matters, and there was no direct corroboration of the testimony of either by other witnesses. It was simply a question as to which of the two was the most credible and

worthy of belief. The only persons present when the deed was made by the Cooks to Belle D. Wolf were Cook and his wife, John M. Wolf and C. S. Edwards, a notary public who took the acknowledgment. The testimony of the Cooks, briefly stated, in substance was that Wolf began talking about their making him a deed several months before the deed was made; that he claimed to be unsafe and wanted the deed to make him secure. He represented to the Cooks that his wife owned the mortgage and called at their home several times to see them about making a deed. He explained to them the costs and expense of the procedure in foreclosing a mortgage and what the rights of the mortgagee were in such a case. The Cooks were ignorant people, knew nothing about such matters and did not advise with any attorney but relied upon Wolf, who claimed to know all about court proceedings and foreclosures. Mrs. Cook testified she had absolutely no knowledge that the indebtedness represented by the mortgage, or any part of it, was not genuine; that when she expressed surprise to Wolf at the large amount of it he assured her it was all for money actually loaned her husband. The Cooks testified that when Wolf came to their home December 2 with the deed already prepared in which his wife was named as grantee, accompanied by the notary public to take the acknowledgment, they did not want to make the deed, and that Wolf and the notary remained there endeavoring to get them to execute it from four o'clock in the afternoon till after dark. Wolf further represented that in addition to the real estate mortgage he held a valid note secured by chattel mortgage on Cook's personal property, and he threatened to foreclose both mortgages, have a receiver appointed for the land and sell the personal property under the chattel mortgage; that a receiver would be appointed in the Mattox foreclosure sale and the rent and the possession of the land taken from the Cooks; that Wolf would foreclose his mortgage, take a judgment over against

Cook for any deficiency, and hold the judgment for collection until such time as Cook inherited property from his father, who was a man of some wealth.

Wolf testified the proposition to make a deed to the land was made by Cook; that he told Cook he did not want the land,—that all he wanted was his money,—and suggested they could make a deed to Sentel if they desired, but Cook refused to do that; that he (Wolf) and his wife went to Cook's house in October, 1914, at the request of the Cooks, who then proposed to make a deed to Mrs. Wolf. She said she was not able to carry it and did not want the deed and suggested they make a deed to Cook's father, but nothing was done at that time. On the day the deed was made, December 2, Wolf, with C. S. Edwards, a notary public, went to the Cook home with the deed, in which Mrs. Wolf was named as grantee. Mrs. Wolf was then confined to her home with illness. On one occasion Wolf told the Cooks his wife was worrying because she did not have the money to redeem from the Mattox foreclosure sale, and that if she foreclosed her mortgage she would ask for a strict foreclosure and a receiver. They offered to make a deed to Wolf, but he declined and said he was not able to carry it. At the time the deed was made Wolf was at Cook's house an hour and a half,—possibly more. He denied making any threats or false representations to coerce or induce the Cooks to make the deed. He said they fully discussed the situation and indebtedness of the Cooks, and they finally agreed to make a deed to Mrs. Wolf and pay Wolf $175, which was secured by chattel mortgage, and that would be a complete settlement of all matters between them. At Mrs. Cook's request the amount secured by chattel mortgage was reduced to $150. The Cooks executed the deed and Wolf wrote and signed a receipt to them acknowledging payment of all debts and demands, real estate mortgages, and all of a certain chattel mortgage except $150.

Edwards testified Wolf told the Cooks he would rather have the money than the deed; that Mrs. Cook's only objection was to a chattel mortgage which she wanted Wolf to surrender, but he refused to do so; that he went with Wolf to the Cook home to take the acknowledgment; that Wolf said they had agreed to sign the deed; that he did not remember any talk about foreclosing a mortgage by Wolf. Mrs. Wolf testified she told the Cooks in the fall of 1914 she did not want the land.

The court, after reciting in its decree the substance of the threats and representations made by Wolf, found they were relied upon by the Cooks and that they were thereby influenced to make the deed; that they were in straightened financial circumstances and had no money; that Wolf took advantage of their necessities to press a hard bargain in obtaining the deed; that Wolf's actions were fraudulent and oppressive and amounted to equitable duress; that the Cooks were ignorant of their lawful rights, and that the representations and statements made by Wolf to them were made for the purpose of inducing them to execute the deed conveying the land to his wife. Here, again, what the actual facts were attending the securing of the deed depended upon the weight and credit to be given to the testimony of those who testified on that subject. Before we would be authorized to reverse a decree on the ground that it was not supported by the evidence we must be able to say that it was palpably contrary to the weight of the testimony. We are unable to give any good or valid reason that would justify us in holding the decree is palpably contrary to the weight of the evidence. The same would probably be true if the court had found and decreed the other way. The decree is quite lengthy and sets out the facts pretty fully. It is evident the testimony received the careful consideration of the chancellor who entered the decree. The account is stated in great detail in the decree, and the circumstances occurring at the time of the execution of the deed are also

set out in the decree. It cannot be said that the account as finally stated and approved by the chancellor, or the recitals in the decree as to the facts and circumstances which induced the execution of the deed, are unsupported by or palpably against the weight of the testimony.

It is insisted by appellant that the facts and circumstances as held by the decree to constitute duress are insufficient to authorize setting aside the deed. It has been held that where the action of a creditor was oppressive and unconscionable and intended to coerce a debtor without funds or resources to convey his property for a grossly inadequate consideration, a court of equity will not consider the consent thus obtained sufficient to fix the rights of the parties; that necessitous men are not, truly speaking, free men, and an unconscientious advantage which ought not to be retained is sufficient to avoid the conveyance. The cases so holding were cited with approval in *Brueggestradt* v. *Ludwig,* 184 Ill. 24. What will be sufficient in equity to avoid an act on the ground that it was performed under such circumstances that the party seeking relief was deprived of that free exercise of the mind essential to a valid contract must be considered in connection with the person acted upon. The decree finds that at the time the deed was made to Belle D. Wolf, Cook's actual indebtedness to John M. Wolf was between $600 and $700. The land was incumbered by a mortgage which then amounted to approximately $2500 and the equity of redemption was approximately of the value of $4000. The Cooks were ignorant people without means or resources, and the circumstances under which the deed was caused to be made, as found and decreed by the court, present a case where equity is authorized to interfere and set aside the deed.

It is also contended that Cook is estopped to raise the question of usury and unlawful commissions because each renewal of a previous mortgage was a payment of the debt, and finally the entire indebtedness except the $175 was set-

tled by giving the $2332.06 mortgage and was so receipted
for by Wolf. It is argued that a contract to pay usury is
not void and can only be interposed as a defense, and Cook
having paid the alleged usurious interest and unlawful commissions is estopped now to set up that matter as a basis
for relief. It is true, when a usurious debt has been paid
off and discharged the debtor has no right of action to sue
and recover the usury paid, but in a continued or connected
course of business, consisting of many notes upon which
usurious interest has been paid for extensions and renewals, the debtor will have the right, in equity, to have all
usurious interest paid by him credited on the present indebtedness, resulting, in whole or in part, from such prior
dealings. *Jenkins* v. *International Bank,* 97 Ill. 568; *Payne*
v. *Newcomb,* 100 id. 611.

When the bill was filed an injunction was issued and
served on Belle D. and John M. Wolf enjoining them from
transferring the land. November 26, 1915, an order was
entered modifying the injunction so as to permit a redemption from the Mattox foreclosure sale. The testimony
shows arrangements were made by Wolf and wife with
U. S. Wolf, brother of John, and Elvis Golden, to furnish
the money for the redemption, and U. S. Wolf attended to
the redemption, which was made January 4, 1916. The
testimony abundantly shows that at the time the redemption was made U. S. Wolf and Golden had knowledge of
the injunction and had a copy of the order modifying it so
as to permit the redemption. What is called a trust deed
was made to U. S. Wolf and Golden by the Wolfs January 4, 1916, to secure them for furnishing the redemption
money, and on February 8, 1916, the Wolfs made them
a warranty deed for the land. Golden has subsequently
conveyed his interest to U. S. Wolf. Wolf's solicitor aided
and assisted U. S. Wolf in making the redemption from
the Mattox foreclosure sale. The court finds in its decree
that U. S. Wolf and Golden were purchasers *pendente lite,*

chargeable with all the allegations of the bill and the terms of the injunction; that they acquired no rights by their purchase superior to those of the Wolfs, and whatever rights they did acquire are made subordinate and subject to the prior rights of appellees. It is urged the decree in that respect is erroneous. Under the evidence in this case the decree is not erroneous in the respect claimed. *Shelton* v. *Franklin,* 68 Ill. 333; *O'Brien* v. *People,* 216 id. 354; 14 R. C. L. 472, 1031; *Lacassagne* v. *Chapuis,* 144 U. S. 119; *Stout* v. *Philippi Manf. Co.* 41 W. Va. 339.

No error is disclosed in the record which would justify or authorize a reversal of the decree, and it is affirmed.

*Decree affirmed.*