THE CHICAGO TITLE AND TRUST COMPANY *et al.* Appellees, *vs.* THE ILLINOIS MERCHANTS TRUST COMPANY *et al.* Appellants.

*Opinion filed February 24, 1928—Rehearing denied April 6, 1928.*

1. LEASES—*lump sum rent is not due until end of term.* Where the rent charge is specified in a lump sum, without provision for time of payment, it is due at the end of the term.

2. SPECIFIC PERFORMANCE—*when complainant must show performance of promise—leases.* A party seeking specific performance of a contract must show performance on his part of any representations or promises of future acts in reliance on which the defendant entered into the agreement, but a promise by a lessee may under certain circumstances be regarded as a part of the rent charged, in which case it will be subject to the rules of law applicable to the payment of rent.

3. SAME—*when a lessee is not in default of right to exercise option.* Where a lessee agrees to cut timber and underbrush from the leased premises in clearing it up for use and to turn over to the lessor any surplus timber, or cash from the sale thereof, after deducting the expense of clearing, failure to clear up the premises does not preclude the lessee from exercising an option to purchase, given in the lease, where the timber was not to be cut and delivered by a certain time and where there is nothing to indicate that the agreement in regard to the timber was the inducement to the giving of the lease and option, as the exercise of the option renders performance of that agreement unnecessary.

4. SAME—*burden is on defendants to prove charge of unfairness in contract.* The claim that the contract is unfair is an affirmative defense, the burden of proving which rests upon the defendants in an action for specific performance.

5. SAME—*rise in value of property will not defeat specific performance of option.* A subsequent rise in the value of property contracted for, over the price named in an option contract, is not ground for declaring the contract unconscionable.

6. SAME—*inadequate consideration will not defeat performance, in absence of fraud.* Where parties competent to contract have entered into a valid contract for the sale of land, courts of equity will enforce it as a matter of right where it is fairly and understandingly entered into and no circumstances of oppression and fraud appear; and inadequacy of consideration or exorbitance of price will not, in the absence of fraud, constitute a defense to a bill for specific performance.

7. SAME—*when finding of the chancellor will not be disturbed.* Unless a reviewing court is able to say, from reading the abstract of the evidence, that the manifest weight of the evidence is contrary to the finding of the chancellor on the question whether the defendant was competent to contract or was fraudulently overreached, such finding will not be disturbed on review.

8. SAME—*when premises are sufficiently described in option.* A lease of "the north three-quarters, west one-half, southwest quarter (except the west five acres) of section 14," etc., which gives an option to purchase the described premises, contains a sufficient description to warrant specific performance of the option, where it is conceded that the tract contains fifty-five acres which the evidence clearly shows were owned by the lessor.

9. SAME—*when a party is not incompetent witness under section 2 of Evidence act.* Where it is claimed that a defendant trustee's *cestui que trust* was incompetent to enter into the contract specific performance of which is sought, a party interested as complainant is not incompetent to testify under the provision of section 2 of the Evidence act making any interested party an incompetent witness when "any adverse party sues or defends as the trustee or conservator" of an incompetent person, where there has been no finding of any court that the *cestui que trust* was an incompetent person, although a guardian *ad litem* had been appointed for him by reason of his advanced age.

10. SAME—*when cestui que trust not a necessary party.* A court of equity will adjudicate the rights of all parties before it whether they are joined as complainants or defendants, and *cestuis que trust* are not necessarily parties to a suit brought by the trustee against a third person where the trustee represents the *cestuis que trust;* and where one of the *cestuis que trust* is made a defendant and defaults, it cannot be contended that he should have been made a complainant, and that the decree, to be valid, must also be at his instance.

APPEAL from the Superior Court of Cook county; the Hon. M. L. McKINLEY, Judge, presiding.

EDMUND S. CUMMINGS, guardian *ad litem,* McCULLOCH & McCULLOCH, and J. SHERMAN DUDLEY, (GROVER C. McLAREN, of counsel,) for appellants.

MILLER, GORHAM, WALES & NOXON, and LEWIS, ADLER, LEDERER & KAHN, (AMOS C. MILLER, and CHARLES LEDERER, of counsel,) for appellees.

Mr. JUSTICE STONE delivered the opinion of the court:

This is an appeal from the decree of the superior court of Cook county granting specific performance of an option to purchase land described in a lease. The lease was given by Miles L. Turner, one of the appellants, to Earl M. Griffey, one of the defendants to the bill for specific performance. A hearing of the cause was had before the court, and a large number of witnesses were heard touching the various issues of fact raised by the answer of the defendants to the bill.

The bill alleges that on May 16, 1924, Miles L. Turner entered into a lease with Earl M. Griffey by which there was leased to the latter, for a period from June 1, 1924, to November 30, 1929, the following described real estate, viz.: "The north three-quarters, west one-half, southwest quarter (except the west five acres) of section 14, township 41, range 13 east of the third principal meridian," which land is situated in Cook county. The rent reserved was $2750 for the term, to be paid in installments of $250 each on June 1 and December 1 of each year. The bill further charges the following facts: The lease contained an option for the purchase of all or any part of the described real estate at any time during the term of five years, at the agreed price of $3000 per acre. On June 30, 1924,

Turner, by an instrument in writing of that date, conveyed the premises to the Illinois Merchants Trust Company and Louis Horner, as trustees, with full right and power in them to execute all deeds and convey a fee simple title to the premises. Griffey, desiring to borrow the sum of $2500, requested that appellee Ernest J. Magerstadt loan him that amount, and offered as security for the loan a third mortgage upon certain real estate in the city of Chicago and an option to Magerstadt for one year to purchase a half interest in the contract of lease and option given him by Turner in the premises for the sum of $10,000. On December 1, 1924, Magerstadt made the loan to Griffey on those terms and such option agreement was executed by them. Griffey's lease and option had been recorded in the office of the recorder of Cook county. This loan and option agreement between Griffey and Magerstadt was also filed of record. Griffey gave Turner his check for the first installment of rent at the time of the execution of the lease and paid the December 1, 1924, installment to Turner's trustees.

Magerstadt elected to exercise the option to purchase a half interest in the lease held by Griffey, and thereupon an agreement in writing was entered into between Magerstadt and Griffey, dated May 1, 1925, by which Magerstadt purchased a half interest in the lease and option. On the same day Magerstadt, as agreed by them, deposited for Griffey the sum of $7500, as the balance of the sum of $10,000 after deducting the loan to Griffey of $2500, for the purchase of one-half of Griffey's interest in the lease and option. On that same day Magerstadt and Griffey entered into a further agreement as a part of the consideration for the transfer to Magerstadt, by which it was agreed that Magerstadt and Griffey would assign to the Chicago Title and Trust Company their interest in the Turner lease and option. It was agreed that Magerstadt should deposit with the Chicago Title and Trust Company the sum of $165,000

329—22

to enable the trust company to purchase the property under
the option, the trust company to purchase the same in its
name.   The agreement further provided that the trust com-
pany should hold the title to the property as trustee for
the equal benefit of Magerstadt and Griffey under its usual
trust agreement, by the terms of which the interest of Mag-
erstadt and Griffey was to be deemed personal property.
The contract also provided: "Said property to be sold at
such price and prices and upon such terms as may be di-
rected from time to time by second party," (Magerstadt.)
By the terms of this agreement Magerstadt was to have a
preferred interest in the proceeds of the re-sale of such land
until the $165,000 advanced by him, with interest thereon,
should be returned to him, after which the proceeds were
to be equally divided.   Magerstadt and Griffey agreed to
execute all documents and agreements that might be neces-
sary to carry the transaction into effect.   Pursuant to this
contract Magerstadt and Griffey on the same day assigned
and transferred, under the terms of a trust agreement of
that date, all of their right, title and interest in and to the
lease and option theretofore held by Griffey, to the Chi-
cago Title and Trust Company.   By this assignment it was
agreed that the trust company, as trustee, was "to have and
to hold said lease and option therein contained in accord-
ance with agreement of even date therewith between the
undersigned and the Chicago Title and Trust Company with
reference to the above described property."   On the same
day the trust company entered into a trust agreement, by
which it was recited that it held the lease and option for
the use of Magerstadt and any other person who might
become entitled to an interest under the trust.   The only
power reserved to the beneficiary was that of direction as
to sale and delivery of title to the property when sold and
a right to receive the proceeds from rentals or from sales
of the premises.   The instrument recites that it was the

intention of the parties to vest the full, legal and equitable title to the premises in the trustee. It recites that the trustee will, on the direction of Magerstadt or such person as may be beneficiary, make deeds for and deliver title to the real estate. The beneficiaries are given the right to manage and control the property, and the trustee is not to be called upon to do anything in such matter except on written direction of the beneficiary. The next day after the execution of these various instruments the Chicago Title and Trust Company, as trustee and assignee of the rights of Griffey under the terms of the lease and option contract, served notice on Turner and his trustees, the Illinois Merchants Trust Company and Louis Horner, of its intention to exercise the option contained in the lease and to purchase all of the property therein described. Later, on May 13, 1925, the Chicago Title and Trust Company, as trustee, tendered to the Illinois Merchants Trust Company and Louis Horner, as trustees, the sum of $165,000 and demanded a deed of conveyance to the property. These demands were refused and this suit followed.

The answer of the Illinois Merchants Trust Company denies that Turner entered into the lease and option referred to in the bill but declares that the instrument was secured by Griffey from Turner by fraud, deceit and misrepresentation and that it is null and void; that no such agreement was ever executed or delivered and no option was given by Turner to Griffey as described in the purported lease; that Turner was unable to read the instrument which he signed and that it was misread to him; that nothing was read concerning the option to purchase, and that Turner, when he signed the instrument, did not know that it contained the option. The answer also charges that the instrument is uncertain and insufficient to describe any land and is not sufficient to entitle complainants to maintain a suit for specific performance. The answer also alleges that no tender of money had been made to Turner; that the

refusal of the trustees to execute the deed was due to the advice of Turner; that the option clause was fraudulent and void, and that the purchase price of $3000 per acre mentioned in the option is much less than the value of the property at the time of the making of the lease; that Griffey took advantage of the advanced age, weakness, inexperience and ignorance of Turner in an attempt to acquire the property for a wholly inadequate consideration; that on May 16, 1924, the date of the lease and option, the land was fairly and reasonably worth at least $6000 per acre and was known to Griffey to be worth that amount, and that Griffey had cheated and defrauded Turner in procuring the option. The answers of Turner, and of Horner as trustee, are to the same effect. On the hearing before the chancellor much evidence was introduced to show that Turner was mentally incapable of transacting ordinary business, and that Griffey had failed to carry out the terms of his contract so far as it related to the clearing up of the underbrush on the premises.

Appellants argue seven points: First, that Griffey was in default on his lease at the time the Chicago Title and Trust Company, as trustee, gave notice of its intention to exercise the option to purchase the property; second, the contract is unfair, unjust and oppressive; third, Miles L. Turner was incompetent to make such a contract; fourth, the option is too uncertain and indefinite to be enforced; fifth, the court erred in permitting Griffey to testify; sixth, it was error to decree specific performance at the instance of the Chicago Title and Trust Company, as trustee, and Magerstadt, without including Griffey as party complainant; and seventh, the decree is erroneous in that it provided that a master in chancery should make a deed in case of refusal of the trustees to execute the same upon a tender of $165,000 to either one of them.

In support of the first contention, that Griffey was in default, it is urged that his contract of lease required that

he clear up the underbrush on the tract leased to him and deliver certain wood to Turner. The evidence shows that the land in question is a tract of 55 acres known as Turner woods, some distance from the city of Chicago, on Lincoln avenue, south of Niles Center. The clauses of the lease relating to the clearing of debris from the premises, as to which it is contended Griffey was in default, are as follows: "It is further covenanted and agreed by and between the parties hereto, that in further consideration of the said lease the said party of the second part shall clear and remove from the said premises herein leased all debris caused by fallen and decayed trees and undesirable underbrush, and that it shall be the right of the said party of the second part to sell so much of the said wood that is acquired in the clearing of the premises as aforesaid, in an amount sufficient to cover his costs in clearing and removing the said fallen and decayed trees and underbrush as aforesaid, and that any surplus of either wood or money over and above the said cost of clearing the said premises, as aforesaid, shall revert to the party of the first part." The lease also gives the lessee the right to erect on the premises a dance pavilion, restaurant and automobile sheds and to conduct an amusement park, the title to the buildings to remain in the lessee with the right to remove the same within sixty days after the termination of the lease, and to build roads on the premises. Concerning the cutting and removal of trees for the purpose of erecting buildings and making roads the lease provided as follows: "It is further covenanted and agreed by and between the parties hereto, that the said party of the second part shall have the right to remove and cut down such trees and underbrush as it shall be necessary for him to do in order to erect such buildings as are provided for herein. The wood and timber derived from the removal of the said trees and underbrush as provided hereinbefore shall belong to and be the property of the said lessors. It is further covenanted and agreed by

and between the parties hereto, that said party of the second part shall have the right to make roads and roadways through said premises herein demised and to remove all trees and shrubbery necessary to make said roads, and further to plant such flowers and shrubbery as is necessary to generally beautify the said premises hereinbefore demised, as it seems meet to the said party of the second part; that all improvements in the nature of roadways and landscape gardening as herein provided shall be paid by the party of the second part, and at the termination of this lease shall revert to the lessors. All timber and wood accumulated by reason of the improvements herein provided shall belong to the lessors, to be disposed of at their direction."

It is contended that even though the option were valid, Griffey, and therefore his assignees, could not exercise it without clearing up the down-timber. This contention requires an examination of the character of these obligations. If the promise to clear and remove the timber was a bonus or precedent inducement to secure the execution of the contract it became a fixed liability when the contract was made and comes within the rule laid down by Pomeroy in his work on Specific Performance, section 333, and Fry on Specific Performance, sections 923 and 927, that where a party seeks the benefit of a contract he must show that he has performed, or is ready and willing to perform, the terms of the contract on his part to be performed. Where there are representations or promises of future acts, which promises are shown to be in the nature of a bonus or representations made by the promisor, in reliance on which the defendant entered into the agreement, performance of such promises must be shown. (Pomeroy on Specific Performance, *supra;* Fry on Specific Performance, *supra.*) If, on the other hand, these conditions of the lease are to be considered as a part of the rent charged, they are subject to the rules of law applicable to the payment of rent. It will be noted that there is nothing in the lease fixing the

time in which the underbrush is to be removed. The rule
is in such case, that where the rent charge is specified in a
lump sum, without provision for time of payment, it is due
at the end of the term. (*McFarlane* v. *Williams,* 107 Ill.
33; *Dixon* v. *Niccolls,* 39 id. 372; Taylor on Landlord
and Tenant, sec. 391.) Appellants do not dispute this rule,
but argue that because Griffey's assignee seeks to exercise
the option to take the land it must first be shown that Grif-
fey cleared up the woods. There is nothing in this lease
to indicate that the agreement to clear up the underbrush
was considered a bonus or a condition precedent to Turner's
entry into the lease and nothing in the evidence which leads
us to construe this promise as other than for the payment
of additional rent. The terms of the option in the lease
gave to the lessee the right to take the property and thus
suspend further payments of rent that had not already be-
come due. The provision for clearing out the underbrush
was for the benefit of the property, and the agreement to
deliver surplus wood or cash from sale thereof was one
inuring to the benefit of the lessor. It cannot be doubted
that, so far as the clearing of the brush was a benefit to
the property, the exercise of the option rendered such work
unnecessary, as whatever benefit the property derived passes
to Griffey or his assignees with the purchase of the property.

But counsel urge that this feature of the lease was a
benefit to Turner, in that he was to receive wood or the
cash therefor. The provisions of the lease concerning this
point are, as we have seen, that the lessee is to first have
from the wood sold, the cost of clearing and removing the
fallen and decayed trees and underbrush, and that the sur-
plus, either of wood, or cash derived from the sale thereof,
is to go to the landlord. Concerning this provision, testi-
mony was offered on behalf of appellants for the purpose
of showing the amount and value of the wood to be ob-
tained by clearing up the underbrush and fallen trees and
the cost of marketing the same. For this purpose the tes-

timony of the witness Allan McGregor was offered. It appears from the record and supplemental abstract, however, that the testimony of McGregor was on motion of appellees stricken out. The remaining testimony in the record pertaining to the value of the wood or cost of clearing the underbrush and fallen trees is that of the witness Albert L. Jones, called by appellants. This evidence, as shown also by the record and supplemental abstract, is that the wood would not pay for the cost of clearing. This witness stated that it would require $1000 an acre to clear it up as his place was cleared and that the wood would not pay for the expense. This is the only evidence on the question. The record therefore is barren of any testimony showing that the lessor would be entitled to any wood or money from the clearing up of the underbrush and fallen trees, since he was to have but the surplus above the cost of clearing and removing the decayed trees and underbrush. It cannot, therefore, be said that the lessee was in default of covenants to supply wood to the lessor.

The other provisions as to furnishing wood to the lessor are contained in the remaining clauses herein quoted. It will be observed that these confer the right on the lessee to build buildings and roads and to remove and cut down such trees as it may be necessary to remove. The wood and timber derived from the removal of such trees and underbrush for those purposes is to belong to the lessor. These provisions confer certain rights on the lessee, but there is no obligation either to build a pavilion or to build roads, and as neither were built before the exercise of the option there is no unperformed obligation on the part of the lessee to deliver wood.

The contention of appellants as to the default of Griffey cannot be sustained.

The second contention is that the contract was unfair and unconscionable, in that the land was to the knowledge of Griffey worth a much larger sum than the purchase price

named in the option contract. The land consists of a wooded tract of 55 acres. There is evidence in the record tending to show that a part or strip of the land lying along Church street, of a depth of 165 feet, was worth more than the balance. This strip contains about five acres. Appellants' witness Lawrence R. Wright testified it was worth four times as much per acre. He had been in the real estate business about three months. Appellees' witness William M. Brinkman testified it was worth twice the value of the balance of the property per acre. He had been in the real estate business for thirty years and had had considerable experience in the particular district in which this land is located. The claim that the contract was unfair was an affirmative defense, and the burden of proving that defense rested on appellants. It cannot be said that the evidence sustains their contention that the Church street strip was worth four times as much as the balance. The greater weight of the testimony is that the 55 acres as a whole were worth at the time of the signing of the lease and option contract, approximately $2000 per acre. The option contract was for sale of this land at $3000 per acre. There is evidence showing that at the time of the hearing it was worth $6000 per acre, but the evidence also showed that the rise in property had been caused by the buying of a right of way for a proposed extension of a railroad through the district of Niles Center. The record shows that the Chicago North Shore and Milwaukee railroad began, some time previous to the execution of this lease, to purchase a right of way through Niles Center for the Skokie Valley line, as it is called, of that railroad, and that as a result an activity in real estate in the vicinity of that road was started. This land is located one and three-quarter miles from Niles Center station and one and one-half miles from the Evanston-Church street station of the elevated railroad. The fact of a subsequent rise in the value of property con-

tracted for, over the price named in the option contract, is
not ground for declaring the contract unconscionable.

Counsel for appellants urge that by the terms of the
contract Griffey, had he so chosen, could have taken any
part of the 55 acres, and therefore could have purchased
only the Church street strip, shown to be much more valu-
able than the balance. This question is not in the case.
His assignee did not choose to purchase only the Church
street strip but chose to take all of the tract. The purchase
of the Church street strip is not the option it is sought to
enforce. It is the general rule that inadequacy of consid-
eration, exorbitance of price or improvidence in a contract
will not, in the absence of fraud, constitute a defense to a
bill for specific performance. (*Woodrow* v. *Quaid,* 292 Ill.
27; *Zempel* v. *Hughes,* 235 id. 424; *Ullsperger* v. *Meyer,*
217 id. 262.) Courts of equity function for the purpose
of enforcing contracts rather than for their evasion. Where
parties are competent to contract and enter into a contract
fairly and understandingly, the wisdom or folly of their
contract, when such contract is made for a consideration
and without fraud, is not a matter with which the court can
be concerned. (*Keogh* v. *Peck,* 316 Ill. 318.) Where a
valid contract for the sale of land exists, courts of equity
will enforce it as a matter of right where it is fairly and
understandingly entered into and no circumstances of op-
pression and fraud appear. (*Fagan* v. *Rootberg,* 320 Ill.
586; *Gottlieb* v. *Kaplan,* 319 id. 60; *Danberg* v. *Langman,*
318 id. 266; *Dime Savings and Trust Co.* v. *Knapp,* 313
id. 377; *Park* v. *Koopmann,* 311 id. 350; *Keogh* v. *Peck,*
*supra.*) The contention of unfairness of this contract is
not sustained by the evidence.

The third contention is that Miles L. Turner was in-
competent at the time of the execution of the lease and op-
tion; that he was unable to comprehend the nature of the
contract he was signing. On this question seven witnesses
were heard on behalf of appellants and thirteen on behalf

of appellees. Turner, according to his own testimony, is about sixty-four years old. Other witnesses gave as their judgment that he was older. It appears that no one knew his exact age. He stated that the family Bible in which the record of his birth was kept had been lost, and that he did not know, and that no one knew, how old he was. It appears that after attending the public schools in his youth he studied for some years in the Northwestern University preparatory school and later attended college at Woodstock until about twenty years old. After leaving school he engaged in farming with his father. While a young man he purchased 82 acres on Milwaukee avenue, near Glen View, and paid for the same. According to all the evidence he has always been industrious, and it is evident that he has been very close in money matters and has accumulated a very substantial competence for his old age. The evidence shows that from 1913 to 1923 he engaged in six real estate transactions. There is no evidence in the record that he ever lost any money by reason of these transactions or that he had ever wasted his money or made a bad bargain prior to the contract in question. He was on the witness stand for a day and a half. An examination of his testimony discloses that he was even shrewd concerning the effect of his testimony as to his ability to deal in real estate, repeating more than thirty times that he could not deal in real estate and therefore never tried,—that others transacted those matters for him. Many of these assertions were made as volunteer statements. These statements are not borne out by the record. The evidence shows that it required about thirty days to close this transaction between him and Griffey. The land leased and as to which the option was given had never been rented. The only income from it had been a few dollars a year secured from the neighbors for the privilege of pasturing cattle on it. Complainants' evidence shows the price was also fixed by Turner and was above the market price at that time. Of the seven

witnesses offered to prove his incompetency none of them testified that they thought him insane, but the effect of their testimony was that they did not consider him competent to handle land transactions. On the other hand, thirteen witnesses testified that they considered him capable of transacting business of the character in question here. Of these, eleven were his neighbors and friends who had known him for many years. They all testified that they had never heard his mental competency questioned. It is in evidence that at the time he and Griffey entered into this contract a petition had been filed in the probate court through the instigation of a brother to declare him incapable of transacting his affairs and business, and that as a result of this petition, though no hearing was had thereon, he was induced by the probate judge to transfer his property to the Illinois Merchants Trust Company and Louis Horner, as trustees. Though the trustee Horner has the same name as the probate judge, the evidence shows that they are in nowise related. It also appears that Turner had made statements tending to indicate that he and his sister, Mary, with whom he lived, did not intend to leave their property to their brothers and sisters. It is apparent from the testimony of Turner on the witness stand, as well as from other evidence in the case, that he resented the proceeding by which he was induced to turn his property over to trustees. The evidence shows that he has never accepted any of the income from the property from the trustees and frequently referred to it as a "pension." On the witness stand, however, he referred to his trustees in words of praise. Turner and his sister, Mary, both testified that at the time of the making of the lease the option contract was not in it, the effect of the testimony being that the option contract was a forgery. They are wholly uncorroborated in this record as to that matter. Horner, one of the trustees and an appellant here, testified that he was present when Griffey read over the lease to Turner and his sister and that the option provision

was read to them, and they said as to that and other provisions of the lease that they were as they wanted them. The chancellor saw and heard the witnesses. It is a well recognized rule in such a case that unless a reviewing court is able to say, from reading the abstract of the evidence, that the manifest weight of the evidence is contrary to the finding of the chancellor, such finding will not be disturbed on review. (*Cook* v. *Wolf,* 296 Ill. 27; *Nofftz* v. *Nofftz,* 290 id. 36; *Johnson* v. *McNellis,* 228 id. 351.) We are of the opinion, on reading this lengthy abstract, that the chancellor's finding as to the mental competency of Turner is supported by the evidence.

It is contended as to the fourth proposition, that the option is too uncertain and indefinite to be enforced. The argument is that the description of the land is not sufficient. That description is, as we have seen, "the north three-quarters, west one-half, southwest quarter (except the west five acres) of section 14," etc. Counsel say that one cannot tell by reading this description whether the five acres are to be excepted from the southwest quarter generally, or the west half of the southwest quarter, or the north three-quarters thereof. It is conceded that the tract described contained 55 acres. The language "except five acres" must be taken as an exception from the land granted by the description. That land is the north three-quarters of the west half of the southwest quarter of the section. The north three-quarters of the west half of a quarter-section of land contains 60 acres. An exception of five acres would leave a tract of 55 acres. An exception in a grant is a reservation. It cannot well be said that the language "except the west five acres" can relate to any tract of land not described as granted by the lease or option. Unless some other meaning is plainly indicated, an exception, by the ordinary construction of the term, applies to the tract described. The same description is used in Turner's deed to the trustees. In addition, the evidence clearly shows the tract which Turner

actually owned, and even though the language were ambig-
uous, (which we do not concede,) evidence of the property
actually owned by Turner renders the description sufficient
to support the decree. (*Decker* v. *Stansberry*, 249 Ill. 487.)
This contention cannot be sustained.

The fifth contention is that the court erred in permitting
Griffey to testify, on the ground that the trustees were de-
fending on behalf of an incompetent person, and under sec-
tion 2 of the statute on evidence Griffey's testimony was
not competent. This position is not tenable. That section
provides that no party to a civil action or person directly
interested in the event thereof shall be allowed to testify
therein on his own motion or in his own behalf when "any
adverse party sues or defends as the trustee or conservator
of any idiot, habitual drunkard, lunatic or distracted per-
son." There is no finding of any court that Turner is an
idiot, habitual drunkard, lunatic or distracted person, and
the evidence in this record shows that such is not the fact.
For the purpose of this case one of his counsel was ap-
pointed as his guardian *ad litem* by reason of his advanced
age. Section 2 of the Evidence act does not apply.

It is contended, as to the sixth point, that it was error
to decree specific performance on behalf of the Chicago
Title and Trust Company and Magerstadt, for the reason
that the record shows that Griffey is still the beneficiary
of a one-half interest in the option, and that the decree, to
be valid, must also be at his instance. As we have seen,
Magerstadt and Griffey agreed that the option should be
transferred to the Chicago Title and Trust Company, to
hold the title to the property as trustee under its usual
trust agreement. The property was to be sold as directed
by Magerstadt. The assignment to the Chicago Title and
Trust Company conforms to the agreement between Grif-
fey and Magerstadt that the property should be sold by
the trustee as directed by Magerstadt. The trust company

took the legal and equitable title to the property, therefore Griffey was not a necessary party complainant. He was made a party defendant and defaulted. The court had jurisdiction of him and his rights in the subject matter, and the decree was binding not only on him but on anyone who should take under him. It is immaterial in equity whether a party is joined as complainant or defendant. The court will adjudicate the rights of all parties before it. *Cestuis que trustent* are not necessary parties to a suit brought by a trustee against a third person where the trustee represents the *cestuis que trustent.* (*Sapp* v. *Phelps,* 92 Ill. 588; *Vetterlein* v. *Barnes,* 124 U. S. 69.) All rights of Griffey are adjudicated in this suit, and the failure to make him a party complainant is not a matter of which appellants can complain.

It is contended as to the seventh and last proposition that the decree is erroneous because it directs that a deed be made by the master in chancery in case the trustees refuse to convey on tender of the sum of $165,000 to them or to either of them. This position is not sound. The tender of the $165,000 before suit was made to both of the trustees. The refusal to convey was by both. The decree provides that if the trustees do not convey, a master in chancery shall execute the deed. The payment of the money to one of these trustees is payment to both. No disadvantage to appellants or advantage to appellees can possibly arise by reason of this language in the decree.

We are of the opinion, from a view of the entire record, that the chancellor did not err in decreeing specific performance.

The decree will be affirmed.

*Decree affirmed.*