(30808.—

LEE HAYES *et al.*, Appellees, *vs.* ELIZABETH M. DISQUE, Appellant.

*Opinion filed November 18, 1948.*

EDWARD E. ADAMS, of Taylorville, for appellant.

PROVINE, PINKERTON & MILEY, of Taylorville, for appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

The plaintiffs, Lee and Gladys L. Hayes, filed their complaint against the defendant, Elizabeth M. Disque, in the circuit court of Christian County for specific performance of a contract to sell real estate. Defendant interposed an answer, plaintiffs replied, alleging new matter not material to the present inquiry, and defendant answered plaintiffs' reply. Evidence was heard by the chancellor. From a decree entered granting plaintiffs the relief sought, defendant prosecutes this direct appeal, a freehold being necessarily involved.

From the pleadings and the evidence, it appears that, since 1940, defendant has owned a farm of 234 acres in Christian County. The tract, familiarly known as the Mundhenke farm, is located near the village of Palmer. Defendant has been a resident of California since 1900. Prior thereto, she lived in Christian County. The farm in question was owned by her parents. Defendant's brother, Edward Mundhenke, a farmer, lives about a mile from the Mundhenke farm and had farmed the land before defendant bought it. Since 1940, he has managed the farm, except during the periods when his sister made visits to Illinois. Roger Williams, defendant's tenant, both prior to and since 1940, has lived on the property. Mundhenke collected the proceeds of his sister's share of the crops grown on the farm and sent the money to her in California. The crops were always sold to the Farmers Grain Company in Palmer. Although defendant was seventy-eight years of age at the time of the challenged transaction, she was in good physical condition and mentally alert. She had acquired more than the average business experience while living in California. Our examination of her testimony discloses her to be a highly intelligent and capable woman.

Plaintiff, Lee Hayes, lived in Taylorville but owned a farm near the Mundhenke farm. Neither he nor his wife, who is a niece of defendant, had ever transacted any business for her or had any business transactions with her relative to the farm, or otherwise.

In the summer of 1947, Gladys Hayes inquired, in behalf of her husband, whether defendant's farm was for sale and, if so, the price. Defendant replied, saying that she wanted $100 per acre. Mrs. Hayes answered, submitting her husband's counter-offer of $20,000 for the land. On September 26, 1947, defendant came to Illinois and, while here, stayed at the homes of plaintiffs and her brother. During the course of the ensuing negotiations, defendant rejected the counteroffer of $20,000 and a mutually satisfactory price of $100 per acre, or an aggregate price of $23,400, was agreed upon, the initial payment to be $1000 and interest on the balance of the purchase price at the rate of four and one-half per cent. Defendant had been here about ten days when this tentative basis for an agreement was reached. A written agreement was executed on October 10, 1947. So far as relevant, the agreement provides for payment of $1000 in cash upon execution of the agreement, and the balance of $22,400 by notes secured by mortgage, one for $2400 payable on December 15, 1947, a second for $4000 payable one year after date, and a third note for $16,000, due October 10, 1957, all notes to draw interest from date at the rate of four and one-half per cent per annum. The single portion of the agreement giving rise to this action is the following provision: "Buyers shall be entitled to receive all uncollected landlord's share of the 1947 crops upon said premises and shall pay taxes for 1947 thereon due in 1948." The purchasers were to be entitled to possession on March 1, 1948.

During the two weeks between her arrival and the day the agreement was signed, defendant discussed the sale of her farm and the terms of the transaction with several

persons. The second day, she drove in the vicinity of the farm with a farm manager named Tedrow, looked at and discussed with him his crop of soybeans and its prospects. Hayes took defendant to her brother's farm in the mornings en route to his farm and brought her back in the evenings unless she stayed overnight at her brother's farm. A first draft of an agreement was prepared about October 5 and defendant discussed its terms with Hayes. She also took the draft to her brother's farm and he read and commented on it, "My brother said he wouldn't sign it." At the time, he was combining beans for other farmers in the vicinity and was at home in the evenings. On October 8, defendant, Hayes and Edward Mundhenke repaired to the office of the attorney who had drafted the agreement. He read aloud each paragraph. The principal matter considered was whether plaintiffs should pay the taxes and receive the growing crops and start paying interest on the balance of the principal immediately or, instead, whether defendant should pay the taxes, retain the growing crops and receive no interest until March 1, 1948. At this meeting on October 8, the agreement was altered to provide that defendant should pay the taxes and retain the crops and that interest upon the balance of the purchase price should not commence until March 1. Prior to the close of the meeting, however, an agreement was reached that plaintiffs would pay the taxes, receive the growing crops and pay interest on the balance of the sale price from October 10, 1947. The attorney was directed to revise the agreement and advise Hayes when it was ready. The revised agreement was received by Hayes on October 10 and executed by the parties at his home on the day named. Plaintiffs made the agreed down payment of $1,000 upon the purchase price to defendant at this time. She continued to stay at the homes of plaintiffs and her brother and the transaction was apparently quiescent until the attorney informed Hayes that he had approved the title and that the notes, mort-

gage and deed had been prepared and were at his office. Arrangements were made for the parties to execute these instruments at his office on October 25. In the meantime, the soybeans had been fully harvested and, when the appointed day arrived, defendant refused to go to the attorney's office, declaring that she would not sign anything in view of the ascertained value of the soybean crop. A few days later, on October 28, defendant, her tenant and her brother went to the grain elevator where the 1947 crops had been delivered and she obtained a check for $2006.67, in partial payment of the landlord's share of the crop of soybeans. The balance of the landlord's share was $112.67 and the share of the corn crop $373.05, making the landlord's share of both crops $2552.39. Upon learning of this action, Hayes advised the grain company of his rights under the agreement of October 10 and payment was stopped on the check. On November 25, 1947, plaintiffs called on defendant at her brother's home and tendered to her the notes and mortgage and requested that she execute a deed to the real estate. This, she refused to do, and plaintiffs instituted this action against her on the same day.

By their complaint, plaintiffs alleged that they had performed all conditions precedent on their part and were ready, able and willing to perform the agreement but that defendant had refused to accept the promissory notes and mortgage tendered to her and, in turn, to deliver to them a warranty deed to the property. Answering, defendant averred that her signature to the agreement of October 10, 1947, was obtained by undue and unfair means and practices, misrepresentations and deception, and that her signature was written under a misapprehension of material and relevant facts; that, during the negotiations leading to the execution of the contract, repeated representations were made to her by plaintiffs that the crop of soybeans generally, and upon her land, in particular, would be very poor

and of little value for the current year; that Hayes not only represented, but repeated and reiterated to her, that the amount of taxes on the land for the year 1947, which it was proposed he should pay, and the value of the rents then unpaid, which he proposed to collect, would not differ by as much, or more than, fifty dollars; that the representations were false and misleading, and were made with the intent to induce her to consent to the retention by plaintiffs of all rents then uncollected and, in brief, to affix her signature to the instrument, and that had she not misapprehended the actual conditions as they existed, and believed in and relied upon the representations described, she would never have consented to a sale of the premises on the terms set out in the instrument executed on October 10, 1947.

The evidence with respect to the statements made concerning the soybean crop is not in dispute. According to defendant, every time she and Hayes talked about the bean crop, he commented, "There will not be fifty dollars difference between them either way after the crop is in," and, at other times, that the difference would not be over one hundred dollars. Hayes admits that, at the conference at the attorney's office, he stated that he did not think, "The taxes and interest and the crop would be between fifty and a hundred dollars difference. I was honest in thinking that at that time too. Well, the taxes is three hundred and thirty-four dollars * * * and the interest on the money from October first to March first would have been between three hundred and four hundred dollars. The beans were green and they were subject to frost any day, if we would get a large frost. The beans are not a sure crop until we get them in the elevator anyway." Hayes added that he did not know at this time what the value of the crop would be, and that he had no particular information about the yield on the farm, "only my own judgment." Referring to the tenant, defendant testified, "He said there seemed to be a good crop." Manson Williams, father of Roger

Williams, testifying for defendant, stated that he was familiar with crops on the Disque farm during the past year, adding, "I put them in and helped cut them. It was a generally poor crop. The whole crop looked like it would make just about what it did. There was probably thirteen acres planted before the rains, * * * it looked like it wouldn't make anything, but it did make fifteen bushels to the acre and that was poor, I think." Her brother advised her to retain the crops. According to her, "He said he hadn't been through them beans but you keep the crop but he didn't say how many there was." On October 9, the day before the contract was signed, the tenant, Roger Williams, combined a part of the beans. Defendant testified, "The beans were combined out there the day before I signed the contract." Edward Mundhenke telephoned defendant that Williams had combined ninety-three bushels of beans. When she passed this information on to Hayes, he replied: "Well, if he did, I bet he combined the whole forty to get it." The foregoing and other evidence discloses that, during the two weeks between defendant's arrival in Illinois and the execution of the contract, she was debating whether to pursue one of two courses with respect to the crops and the 1947 taxes, first, to retain the crop of soybeans and corn then growing on the farm, pay the 1947 taxes of $372, and forego until March 1, 1948, any interest on the remaining balance of the purchase price amounting to $22,400, or, second, to receive interest, commencing October 10, 1947, on the unpaid balance of the purchase price of $22,400 and for plaintiffs to retain the growing crops and pay the 1947 taxes. The attorney testified that Hayes said, " 'It doesn't make any difference to me which way we do it. You simply fix it the way you want it to be done,' " and "I recall that Mrs. Disque was apparently as reluctant to choose. She finally said, 'I believe I will take the crop and pay the taxes and let you start the interest as of March first.' "

Seeking a reversal of the decree entered against her, defendant contends that the evidence discloses that the agreement between the parties was not fairly and understandingly entered into but, instead, was obtained by undue means, unfair practices or deception; that enforcement of the contract will be inequitable and oppressive to her and that, in consequence, the chancellor erred in directing her to pay plaintiffs the sum of $2552.39, representing the value of the growing crops on the farm. The decisive issue made by the pleadings and argued by the parties upon this appeal is essentially one of fact. Unless we can say that the decree is against the manifest weight of the evidence, it will not be disturbed. In this regard, defendant does not claim that any fiduciary or confidential relationship existed between plaintiffs and herself and, upon oral argument, her attorney made this same concession.

The evidence does not admit of the conclusion that plaintiffs perpetrated a fraud upon defendant by misrepresentation or deception concerning the value of the growing crop of soybeans on her land. There is but little, if any, argument concerning the value of the corn crop which was, apparently, a failure, as the landlord's share of one-half brought only $375 for the corn grown on thirty acres. Defendant had owned the farm since 1940 and in each of seven years had received from her manager the landlord's share of the proceeds of the crops grown on the farm. She visited the farm prior to signing the contract in controversy and, in addition, was in the vicinity of the farm on several occasions during the two weeks prior to October 10, 1947. She sought, received and rejected the advice of her brother who managed her farm and represented her generally, in Illinois, in business matters. Her testimony that she relied entirely upon the statements of plaintiff Hayes to the effect that he thought the crops would be poor approaches the incredible. A review of all the evidence fails to disclose any positive assertion of fact by Hayes to

defendant. He did express his opinion, and this opinion turned out to be erroneous. The expressed opinions of her brother and the tenant turned out to be more accurate. For reasons best known to herself, she elected to place reliance on the opinion of the prospective purchaser who had never farmed the land in question and, so far as the record discloses, had seldom set foot upon the farm. From the evidence, it is abundantly clear that defendant was attempting to make a good bargain for herself. We find no overreaching, or attempted overreaching, on the part of plaintiffs. Defendant obtained the price she asked for the farm, and the disposition of the growing crops, the payment of taxes, and the time for the commencement of the payment of interest were entirely in accordance with her desires as they obtained on October 10, 1947. The contract, as executed, is the contract she wished. On the other hand, plaintiffs were willing to buy the farm at the defendant's price upon alternative terms relating to the growing crops, payment of the 1947 taxes, and the time for the interest payments to begin. During the course of preliminary negotiations, defendant expressed her desire to retain the growing crops and to pay the 1947 taxes. These terms were entirely agreeable to plaintiffs. In like fashion, when she changed her mind and decided to forego the growing crops and requested that a provision be incorporated in the contract for retention of the crops by plaintiffs and payment of the 1947 taxes by them, this, too, was satisfactory to plaintiffs. In short, either of these two courses was open to defendant and each was equally agreeable to plaintiffs. She made her choice, in the light of the conflicting opinions of her brother, her tenant and Hayes, added to personal observation on her part and long-past experience and knowledge as to the value of the crops. By October 10, 1947, all, or substantially all, of the soybeans had been combined. An inquiry directed to her brother or the tenant, or a trip to the farm, would have supplied

her with accurate information as to the quantity of soybeans actually harvested if this information had not already been obtained by her. Her profession of ignorance of the amount and value of the crop comes with poor grace. A reasonable surmise is that she was content with the bargain made until the weights and value of the soybeans were actually determined at the grain elevator. Manifestly, the time had passed for an effective change of mind on her part.

The charges of misrepresentation and deception in the present case are based upon statements relative to future or contingent events, expectations and probabilities, rather than upon present or pre-existing facts. Such statements do not generally constitute fraudulent misrepresentation or deceit but are regarded as mere expression of opinion or mere promises or conjectures upon which the other party has no right to rely. (23 Am. Jur., Fraud and Deceit, sec. 35; *Brodsky* v. *Frank,* 342 Ill. 110; *Miller* v. *Sutliff,* 241 Ill. 521.) In short, a charge of misrepresentation must be predicated upon statements of fact, rather than mere expression of opinion or prophesy. Where it appears that a person charging misrepresentation has actually investigated and received information from his own sources, as here, he is not in a position to claim he was deceived. (23 Am. Jur., Fraud and Deceit, sec. 144; *Crocker* v. *Manley,* 164 Ill. 282.) The parties fairly and understandingly entered into a valid contract. Under such circumstances, specific performance of a contract for the sale of land is a matter of right and a court of equity will enforce it where no circumstances of oppression and fraud appear. (*Chicago Title and Trust Co.* v. *Illinois Merchants Trust Co.* 329 Ill. 334; *Kilcoin* v. *Ortell,* 302 Ill. 531; *Miedema* v. *Wormhoudt,* 288 Ill. 537.) Circumstances of this character are lacking in the present case.

The decree of the circuit court of Christian County is right, and it is affirmed.

*Decree affirmed.*