ANDREWS et al. v. CONNOLLY et al.

(Circuit Court, D. Colorado. November 7, 1905.)

No. 4,623.

1. CONTRACTS—DURESS—FAMILY SETTLEMENT.
   A written contract made between brothers to settle long standing disputes in regard to their respective rights and interests in mining property will not be set aside on the ground of duress, because one party who was in possession signed it reluctantly, while it was insisted on by the others, when the other parties thereafter made large advances in reliance on it which he received without objection and used in the development of the property during several years.

2. EQUITY—GRANTING RELIEF TO DEFENDANT—NECESSITY OF CROSS-BILL.
   A court of equity, in granting relief to a complainant, may make it conditional on the doing of equity to defendant by paying a sum to which he is justly entitled, although he has filed no cross-bill therefor.

In Equity.

Harvey Riddell, for complainants.

Hugh Butler, for respondents.

RINER, District Judge. It is impossible to gather from the evidence in this case just what the contract or arrangement, under which the mines in controversy were developed, was between the parties in interest, prior to the date of the written contract of August 13, 1900. The evidence shows, without conflict, that at the inception of the mining venture, out of which this controversy arises, the defendant Patrick Connolly had the possessory right to four mining claims at Leadville, referred to in the evidence as the "Dolly B. Group"; that by some arrangement, made with his brother, Nichols K., and a little later with Nichols K. and Michael Connolly, a large amount of money was furnished by the two last-named brothers to develop the property. It is further shown that between June, 1894, and August 13, 1900, the three brothers had acquired interests in other mining properties in Leadville and had purchased a number of shares of the stock of the Big Six Mining Company. The total amount of money furnished by Nichols K. and Michael Connolly, as the record shows, was $114,-513.43, over and above any proceeds received by them from the operation of the mine. This money, together with certain of the proceeds of the mine, was used for the development of the mine and for acquiring other properties and the stock of the Big Six Mining Company.

The record shows that there were numerous disputes and disagreements between the brothers in regard to the development and expense of operating the mine; that these differences were of such a character that they seriously interfered with the working and development of the property. Prior to August 13, 1900, there was no written contract showing the interests of the respective parties, but the development of the property had proceeded under some verbal agreement or understanding, and, as already suggested, it is impossible for the court to determine just what that arrangement was, as the testimony of Michael

Connolly and Patrick Connolly, they being the only two parties to the contract now living, is squarely in conflict. But I do not consider it necessary, in the view I have taken of this case, for the court to determine just what that verbal arrangement or agreement was. The record shows that differences and disagreements, in relation to the properties and their development, existed, and that these differences between the brothers amounted, at times, almost to bitterness. It further shows that on the 13th of August, 1900, Michael Connolly and Patrick Connolly met in the city of Leadville, and there entered into a written agreement defining the interest each party had or was to have in all of the property, including the Big Six mining stock. The contract was executed by Michael Connolly, for himself and on behalf of his brother, Nichols K., from whom he held a power of attorney, parties of the first part, and Patrick K. Connolly, for himself, party of the second part. There was inserted in this contract a provision in relation to a claim made by Michael Connolly for a balance alleged to be due from the defendant to the two brothers, parties of the first part to the contract, arising out of some oil deal in Pennsylvania in 1875. This provision of the contract, however, requires no consideration, as it is not supported by proof and counsel for the complainants, in his brief, says: "As that item of $15,000 is out of the case, nothing further need be said of it." This, I take it, to be a confession that the provision of the contract, in relation to this $15,000, could not and ought not to be sustained by the court. We have then to deal with the contract, only in so far as it relates to the rights of the parties, in the mining properties at Leadville and the stock of the Big Six Mining Company. As already indicated, I do not consider it necessary to review the history of the various disputes, disagreements, and annoyances arising between the brothers in relation to the operation of their various mining properties at Leadville; nor do I deem it at all necessary to attempt to fix the blame upon any one of the parties in interest. It is all sufficient, for the purposes of this case, that such disputes and disagreements did, in fact, exist, and that the parties attempted to settle them by the written contract of August 13, 1900, wherein the rights of the parties were defined.

The defendant admits the execution of the contract by him, but seeks to avoid it on the ground, as he alleges in his answer and testified, that he was induced to sign it by the threat that the property would be shut down, and that neither Michael, nor his brother, Nichols, would furnish further money to push the enterprise, and that in consequence of his inability to carry on the enterprise himself, and through fear that his brothers would render the property unavailing to him if he declined to sign the contract, he finally executed it in duplicate, keeping one draft for himself, and his brother, Michael, taking the other. His copy he placed upon record. This, he says, he did upon the advice of their bookkeeper, Martin Patrick Connolly. This statement is, however, denied by Martin Patrick Connolly. But even if it be admitted that the allegations of the answer and the evidence of defendant are true, yet I do not think the admission sufficient to show that the contract was executed under duress. It is not necessary to

enter into an extended discussion to show that a contract procured by means of duress is inoperative and void, both at law and in equity, and that actual violence, even at common law, is not necessary to establish duress, because consent is the very essence of the contract, and, if there be compulsion, there is no actual consent, and moral compulsion, such as that produced by threats to take life, or to inflict great bodily harm, as well as that produced by imprisonment, is everywhere, I think, regarded as sufficient in law to destroy free agency, without which there can be no contract, because in that state of the case there is no consent. In its more extended sense, duress may be said to be that degree of constraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or in apprehension to overcome the mind and will of a person of ordinary firmness. Decided cases may be found which deny this rule and hold that contracts procured by menace of a battery to the person, or of trespass on lands, or of loss of goods, cannot be avoided on that account. The reason assigned for thus restricting the general rule is that such threats are held not to be of a nature to overcome the will of a firm and prudent man, because it is said, if such an injury is inflicted, adequate remedy may be had at law. But the modern decisions in this country, I think, hold that contracts procured by threats of battery to the person, or of destruction of property, may be avoided on the ground of duress, because in such a case there is nothing but the form of a contract without the substance. Granting this then to be true, still the concession cannot, I think, benefit the defendant in this case, as the proofs contained in the record are not sufficient to bring the case within the rule. The proofs contained in the record do not show that Michael Connolly did any unlawful act to deprive the defendant of his property, or to compel him to do what he acknowledges he did do, yield to the pressure of the circumstances surrounding him and sign the agreement of settlement. I think the signing of the contract, under the circumstances disclosed by the record in this case, must be regarded, both at law and in equity, as a voluntary act, as it was unattended by any act of violence or threat of any kind calculated in any degree to intimidate the defendant, or to force the result, or to compel that consent which is the essence of every valid contract. Suppose he consented reluctantly, as he doubtless did, still the fact remains that he did consent when he might have refused, and, having consented and signed the contract, I think he is bound by its terms. This is especially true, when we come to consider the character of the transaction and the relation of the parties to the contract. It was entered into for the purpose of defining the rights of the parties and putting an end to the disputes and disagreements which had theretofore existed between the brothers. In other words, it was a contract in the nature of a family settlement or compromise, and, as to such contracts, Mr. Pomery says:

"Compromises, where doubts with respect to individual rights, especially among members of the same family, have arisen, and where all the parties instead of ascertaining and enforcing their mutual rights and obligations, which are yet undetermined and uncertain, intentionally put an end to all

controversy by a voluntary transaction in the way of a compromise, are highly favored by courts of equity. They will not be disturbed for any ordinary mistake, either of law or of fact, in the absence of conduct otherwise unequitable, since their very object is to settle all such possible errors without a judicial controversy."

There is another reason why the court feels obliged to sustain this contract. The evidence shows that after the contract was executed the parties of the first part, until Nichols K.'s death, and after his death Michael and Mrs. Andrews, continued to make advances of money for the purpose of developing these properties, and that these advances amounted to many thousands of dollars. The defendant knew that these advances were being made by these parties in reliance upon the terms of the contract, yet he did not protest against their being made, but received and applied the money, and this situation continued for several years after the contract was executed. While it is true the law gives one, who is induced by fraud to make a contract, the option of rescinding it, yet it imposes upon him the duty to exercise that option with all convenient speed, after his discovery of the fraud. He will not be permitted to lie in wait until time and change make his interest plain and then make his choice. Silence, delay, acquiescence, or the retention of the fruits of the agreement for any considerable length of time after the discovery of the fraud, constitute a complete and irrevocable ratification of the transaction. Rugan v. Saben, 53 Fed. 415, 3 C. C. A. 578; Wheeler v. McNeil, 101 Fed. 685, 41 C. C. A. 604. In other words, I do not think the defendant should be permitted to retain the benefits and renounce the burdens of his agreement. The conclusion reached, is that the complainants are entitled to an equitable lien upon the property described in the contract, to secure their claims against it.

There is another feature of this case, however, which must not be lost sight of. The contract provides that the parties of the first part shall, upon the signing of the agreement, take charge of and control the properties mentioned in the contract until they shall have realized the amount which they contributed and furnished for the development of the properties and to obtain title thereto; that, when this amount has been realized, each of the parties shall have a one-third interest in all of the properties, including the Big Six mining stock. Pursuant to this provision of the contract, Michael Connolly and his brother assumed control of the mine and placed in charge a man by the name of O'Brien. The record shows that O'Brien only remained in charge a few days, and then, at the suggestion of one of the brothers, the defendant again assumed charge of the mine and has been in charge of it ever since. Under the terms of the contract, his custody of the property was the custody of the plaintiffs, and, as the amount of his compensation was not agreed upon, I think he is entitled to receive, and to have deducted from the claim made against the property by the complainants, such compensation for his services as the services were reasonably worth. It is true that no affirmative relief is sought by the defendant, but, I take it, the rule is well settled that a court of equity may always condition its grant of relief to those who seek its aid by the requirement that they shall do equity to their oppo-

nents, and I think equity requires that the defendant be allowed a reasonable compensation for his services from and after the date of the contract. If counsel and the parties can agree upon this amount, the court will adopt it; if not, the case will be sent to the master for the purpose of taking proof upon that question.

While the court is of the opinion that the complainants are entitled to have an equitable lien, for their advances, fastened upon this property by the decree, yet it is unwilling to direct a sale of the property under existing conditions, as it is quite evident that, if the property is properly worked, it will more than pay the indebtedness against it. If the plaintiffs desire to proceed with the operation of the mine, rendering their accounts to this court, until their lien is adjusted and paid off, the decree may so provide; otherwise, the court will hear further from counsel as to the advisability of appointing a receiver to take charge of the property.