98 F.2d 952 (1938)
In re PRIMA CO.
HARRIS TRUST & SAVINGS BANK et al.
v.
KEIG et al.
Nos. 6357, 6413, 6414.
Circuit Court of Appeals, Seventh Circuit.
August 26, 1938.
*953 *954 *955 Charles Le Roy Brown, Jacob Logan Fox and Lionel A. Mincer, all of Chicago, Ill., for appellant Harris Trust & Savings Bank.
Francis X. Busch, James J. Magner, C. Morton Doty, Richard A. Beck, C. Edward Dahlin, and Homer J. Livingston, all of Chicago, Ill., for appellant First Nat. Bank of Chicago.
Paul F. Koenig, of Chicago, Ill., for appellee Marshall Keig, trustee.
Edmund D. Adcock, Eli E. Fink, and John W. Day, all of Chicago, Ill., for appellee debtor.
Alfred M. Rogers, of Chicago, Ill., for appellees certain stockholders.
Before SPARKS and TREANOR, Circuit Judges, and LINDLEY, District Judge.
SPARKS, Circuit Judge.
These actions arose out of a voluntary reorganization proceeding of the debtor, an Illinois corporation, under sections 77A and 77B of the Bankruptcy Act, 11 U.S. C.A. §§ 206, 207. The debtor's petition was approved as properly filed, and Keig, trustee in bankruptcy, was directed to take possession and control of all the debtor's assets, and to carry on the business under the orders of the court. Subsequently, by leave of court, the trustee filed his petition for certain relief against appellants for losses alleged to have been sustained as a result of appellants' mismanagement of the debtor's business, and for repayment of claims alleged to have been wrongfully and unlawfully paid to them by the debtor. On the same day the debtor filed its petition for permission to join in and adopt the trustee's petition, and to support and assist its prosecution, which was granted.
The trustee's petition set forth the history of the debtor; the transactions incident to the employment of Garnett C. Skinner as general manager of the debtor, through the alleged machinations of appellants, and over the objections of the debtor; the charge that Skinner, pursuant to the joint direction and authority of appellants, exclusively controlled and managed the debtor's business and affairs without the direction, guidance or control of its directors and in opposition to its interests, resulting in great losses to the debtor. It further charged that Skinner during his management had wrongfully and injuriously to debtor's interests caused the debtor to issue notes for all of its debts, including $200,000 due to each appellant, and had secured their payment by a trust deed to appellant, the First National Bank; that Skinner had wrongfully caused the debtor to pay to the First National and to Harris the respective sums of $15,700 and $17,625 on July 8, 1936, which hindered, delayed and defrauded other creditors. On these allegations, but more specifically stated, the trustee claimed that the losses suffered during Skinner's management, which began on or about June 25, 1934, and ended August 17, 1936, when the petition for reorganization was filed, were largely due to his mismanagement, and that the banks should answer therefor, and should pay over to the trustee the payments respectively received on July 8, 1936.
Without process the issues were joined by appellants' separate answers which were ordered filed by the court. Both answers denied the charges of the petition. That of the First National Bank began with an express reservation of all benefit of exceptions and objections to the jurisdiction of the District Court over the subject matter of the petition, and concluded with averments that the trustee's petition did not state a cause of action against it, and that the court could not by summary proceedings entertain jurisdiction of the subject matter of that petition.
After extensive hearings, the facts were found specially, conclusions of law were stated, and a decree was rendered adversely to appellants, from which this appeal is prosecuted.
The theories of the trial court, with respect to the losses alleged to have been sustained for which a decree was rendered for $568,895.43, seem to have been:
*956 (1) That Skinner's employment by the debtor was brought about by undue influence of the banks, as a result of which they became trustees de son tort, and as such were required to account for all losses suffered by the debtor during Skinner's employment.
(2) That while the contract was merely between the debtor and Skinner, the banks by their conduct actually became parties to it, whereby the control and direction of the debtor's business was placed in their hands to the exclusion of the debtor's officers and board of directors, and that Skinner was the agent of the banks in the conduct of debtor's business.
With relation to the additional sums of $17,625 and $15,700, found to be due respectively from the Harris Bank and the First National Bank, the court's theory was that these sums were preferences, that is to say, they amounted to transfers of the debtor's property within four months prior to the filing of its petition, and while the debtor was insolvent. Under such circumstances, if they existed and if there were an adjudication of bankruptcy, the transfers would be void, and the property might be reclaimed and recovered in the bankruptcy court, or in any state court which would have had jurisdiction if bankruptcy had not intervened. Section 60 of the Bankruptcy Act, 11 U.S.C.A. § 96. However, neither the trustee's nor the debtor's petition claims that these payments constituted preferences within the meaning of that section. The petitions proceed on the theory contemplated in section 67e, 11 U.S.C.A. § 107(e), relating to transfers which hinder, delay or defraud creditors, which does not apply to purchasers in good faith for a present fair consideration. Under circumstances as designated in this section, it was the duty of the trustee, if the facts warranted it, to recover and reclaim the property thus transferred, by legal proceedings or otherwise, for the benefit of the creditors.
We are first confronted with the question of jurisdiction. Both appellants maintain that the federal court was without jurisdiction, and the First National Bank also contends that the court lacked jurisdiction to enter the decree in a summary proceeding as distinguished from a plenary suit. We shall first consider the latter contention, which we think must be sustained as to the First National Bank.
Courts of bankruptcy possess only such jurisdiction and powers as are expressly or impliedly conferred upon them by Congress. Section 2 of the Bankruptcy Act, 11 U.S.C.A. § 11; Taubel-Scott-Kitzmiller Co. v. Fox, 264 U.S. 426, 44 S.Ct. 396, 68 L.Ed. 770. Section 23 of the Bankruptcy Act of 1898 amended, 11 U.S.C.A. § 46, is as follows:
"(a) The United States district courts shall have jurisdiction of all controversies at law and in equity, as distinguished from proceedings in bankruptcy, between trustees as such and adverse claimants concerning the property acquired or claimed by the trustees, in the same manner and to the same extent only as though bankruptcy proceedings had not been instituted and such controversies had been between the bankrupts and such adverse claimants.
"(b) Suits by the trustee shall only be brought or prosecuted in the courts where the bankrupt, whose estate is being administered by such trustee, might have brought or prosecuted them if proceedings in bankruptcy had not been instituted, unless by consent of the proposed defendant, except suits for the recovery of property under section 60, subdivision b [section 96, subdivision b, of this title]; section 67, subdivision e [section 107, subdivision e, of this title]; and section 70, subdivision e [section 110, subdivision e, of this title]."
60b, 11 U.S.C.A. § 96(b), refers to preferences within four months; 67e, 11 U.S. C.A. § 107(e), refers to fraudulent transfers within four months; 70e, 11 U.S.C.A. § 110(e), provides that the trustee may avoid any transfer that any creditor might have avoided. Each of the subdivisions contains the following clause: "For the purpose of such recovery any court of bankruptcy * * * and any State court which would have had jurisdiction if bankruptcy had not intervened, shall have concurrent jurisdiction."
This section has been construed generally to mean that, in absence of consent of the proposed defendants, who are adverse claimants, suits by the trustee can be brought only in the courts where the bankrupt could have brought them had bankruptcy not intervened, except suits for the recovery of property under the sub-sections referred to. Schumacher v. Beeler, 293 U.S. 367, 55 S.Ct. 230, 79 L.Ed. 433; Taubel-Scott-Kitzmiller Co. v. Fox, supra; In re Goldstein, 7 Cir., 216 F. 887; In re Luken, 7 Cir., 216 F. 890. It is not denied *957 that these appellants were adverse claimants (see Harrison v. Chamberlin, 271 U.S. 191, 46 S.Ct. 467, 70 L.Ed. 897), or that the debtor or the trustee did not have actual or constructive possession of that which they sought to reclaim and recover in their suit (see Taubel-Scott-Kitzmiller Co. v. Fox, supra.) True, the court found that the two payments made by the debtor to appellants on or about July 8, 1936, were preferences; but they could not have been preferences under section 60 of the Act, 11 U.S.C.A. § 96, unless there were a finding of insolvency of the debtor at that time. There is no such finding, nor do appellees claim that insolvency existed at that time.
Furthermore, appellees by their pleadings or otherwise do not claim that these payments were preferences, as defined in section 60 of the Act, but they treat them as transfers within four months prior to the filing of the petition with the intent and purpose on the part of the debtor to hinder, delay, or defraud its creditors, under section 67e, albeit the court made no finding, and there is no evidence to support a finding, that the debtor ever had such an intention or purpose. However, if there were such a finding, based upon substantial evidence, it was the duty of the trustee under section 67e to recover and reclaim the property thus transferred "by legal proceedings or otherwise for the benefit of the creditors." So far as we are advised this clause has never been construed to mean that such a controversy can be determined in a summary proceeding by the bankruptcy court. On the contrary, we think it cannot be so determined, but that resort must be had to a plenary action. Appellees, however, contend that, although the proceeding was summary in character, it was in fact a plenary action, inasmuch as all the evidence which could have been heard in a plenary action was heard. Such fact we think is not always determinative of the question. It would seem that if the hearing were plenary, the judgment should have been plenary and not summary in its character. Here, however, there was a summary judgment requiring payment forthwith, and upon default appellants would be subject to penalty for contempt. Under these circumstances we think the proceedings were in fact summary rather than plenary.
Where a trustee files claims against a third party as to property not in the actual or constructive possession of the bankrupt, and not within either section 60b, 67e or 70e of the Bankruptcy Act, and such third person asserts adversely a defense which is substantial, a court of bankruptcy is without jurisdiction, either summary or plenary. Jaquith v. Rowley, 188 U.S. 620, 23 S.Ct. 369, 47 L.Ed. 620; Harris v. First National Bank, 216 U.S. 382, 30 S.Ct. 296, 54 L.Ed. 528; Park v. Cameron, 237 U.S. 616, 35 S.Ct. 719, 59 L.Ed. 1147. The jurisdiction conferred upon the District Court by the exceptions referred to in section 23b, 11 U.S.C.A. § 46(b), does not extend to any other sections of the Bankruptcy Act, and is a plenary, not a summary, jurisdiction, except in those cases where the bankruptcy court is in possession of the property in controversy. Schumacher v. Beeler, supra; Taubel-Scott-Kitzmiller Co. v. Fox, supra.
It is contended by appellees, however, that there is an inconsistency between section 23 of the Act, upon which the decisions hereinbefore referred to are based, and section 77A and certain portions of section 77B.[1] Hence, they say that the latter sections must prevail. This contention *958 seems to be based upon the words "and its creditors and stockholders" contained in the quoted clause of section 77B (a), 11 U.S.C.A. § 207(a), which relates to the grant of jurisdiction with respect to a subsidiary corporation. It is to be noted that the grant of jurisdiction over "the [original] debtor and its property wherever located," and also the jurisdiction which a federal court would have, had it appointed an equity receiver, omits any reference to "creditors and stockholders," and it seems clear that Congress thus expressly limited the court's exercise of the powers it would have in an equity receivership to "the debtor and its property wherever located," and had no intention of extending such powers to the creditors and stockholders of the debtor. It is to be further noted that the jurisdictional grant with respect to a subsidiary corporation is not defined except by reference to the jurisdictional grant with respect to the original debtor, that is to say, it is to be the same with respect to each.
We are convinced that the intention of Congress was to confer upon the District Court, as to the debtor and its property and the person and property of its subsidiaries, the same powers the court would have had in equity receiverships, and to leave the court's jurisdiction as to creditors and stockholders of the debtor and its subsidiaries as it was under the remaining provisions of the Bankruptcy Act. We feel fortified in this conclusion by the evident purpose of Congress in the light of previous bankruptcy legislation and administration. This we conceive to be the conferring upon the court of jurisdiction of the debtor and its property wherever located, and the same power over the debtor and its property that a federal court would have, had it appointed a receiver. This was done in order to eliminate cumbersome and expensive ancillary proceedings, and to enable the court to operate the property and conduct the business of the debtor pending the reorganization. Moreover, a construction extending the jurisdiction of the District Court to all controversies between the debtor and adverse party claimants would, to the extent of the operations of section 77B, amount to a repeal by implication of section 23. It is not contended that there is an express repeal and we think subdivisions (k) and (o), 11 U.S.C.A. § 207(k, o), clearly negative a repeal by implication.
Justice Hand, in Re Prudence Bonds Corporation, 2 Cir., 75 F.2d 262, said (page 263), "It is clear both from the language used in these subdivisions [77B(a) (o)], and from the consequences of a contrary ruling, that Congress did not intend the bankruptcy court in proceedings under section 77B to take over all litigation between the debtor and third persons." The same conclusion is reached in a cogent and logical construction of section 77B(a), by Mr. Finletter in his "Principles of Corporate Reorganizations" pp. 186, 187. We hold, therefore, that the bankruptcy court was without jurisdiction to hear and determine, either in a summary proceeding, or in a plenary action, the issues presented by appellees' petitions, except as to such appellant who may have consented, if either did.
Each appellant had filed its claim with the trustee for the amount due it under the trust deed, concerning which there was no controversy as to the debtor's liability. Appellees contend that the filing of these claims against the debtor's estate operated as a consent to be sued in the bankruptcy court by the trustee on the matters set forth in his petition. With this contention we are not in accord. True, section 60 of the Act provides for set offs and counterclaims in cases of mutual debts and credits, but the obligations with which we are here confronted are not of that character, and neither can be offset nor counterclaimed against the other. If this judgment is sustained, appellants will be required to pay it, and will be permitted only to participate in a pro rated distribution of all the assets with other creditors of the same class, after all prior claims, if any, have been paid; or participate in the same manner in any plan of reorganization which may be adopted. The court obviously was in accord with this view, for it did not offset one against the other or render judgment over for the excess. It did not allow appellants' secured claims, but apparently deferred the allowance until the payment of the judgment, which *959 was in accordance with the prescribed procedure. Alexander v. Hillman, 296 U.S. 222, 56 S.Ct. 204, 80 L.Ed. 192.
The First National Bank throughout the trial persisted in its objections to the court's jurisdiction, both summary and plenary. It was agreed by the parties that a full presentation of those questions should be deferred until the close of the evidence, and it was done. We find nothing in the record to indicate a consent on its part to waive such objections, and we think it was error to overrule them.
The appellant, Harris Bank, while not expressly consenting to being sued in a summary proceeding, or to federal jurisdiction, did not object to either, and without objections, submitted to a hearing on the merits and participated therein. Under these circumstances we think Harris must be considered as having consented to federal jurisdiction as well as to the summary proceeding. Detroit Trust Co. v. Pontiac Savings Bank, 6 Cir., 196 F. 29, affirmed in 237 U.S. 186, 35 S. Ct. 509, 59 L.Ed. 907; Fairbanks Steam Shovel Company v. Wills, 7 Cir., 212 F. 688, affirmed in 240 U.S. 642, 36 S.Ct. 466, 60 L.Ed. 841. Harris, however, suggests that section 23b, as construed by the Schumacher Case, confers federal jurisdiction, when the defendant consents, only in cases in which the sole plaintiff is a bankruptcy trustee; and that this is the only instance where Congress has ever conferred federal jurisdiction upon the consent of the party sued. For these reasons it urges that the section should be strictly construed, and held not to include a suit by the trustee in which the debtor joins as party plaintiff. Why the debtor desired, or upon what authority it was entitled, to be made a party plaintiff is not apparent. Appellees intimate that the debtor asked for, was granted leave to do, and did nothing more than to assist in the prosecution of the case. That it did this much, and rightfully we think, there can be no question; but that it was made a party plaintiff is likewise conclusively shown by the debtor's petition, the court's order granting it, and the final decree. To the petition or the order Harris made no objections, and the question for the first time is raised here. There was no judgment rendered for the debtor against either appellant, except for its costs and attorneys' fees. There was a sizable money judgment in favor of the trustee, in which eventually the debtor would in all probability participate, but not to any greater extent, or in any different manner, than it would had it not been made a party. Under these circumstances we think Harris is in no position to complain of the fact that the debtor was permitted to join with the trustee as party plaintiff. We do not wish to be considered as approving the joining of the debtor as party plaintiff with the trustee, or as extending the rights under section 23b to any one other than the trustee. Our conclusion in this respect is based upon the failure of Harris to timely assert its rights, and the further fact that under the circumstances presented it was not harmed by the mere joinder.
We shall next consider the findings and decree with respect to the loss said to have resulted from mismanagement. The findings are quite voluminous, due to the incorporation therein of many evidentiary facts, recitals of testimony, and conclusions of law. In order to fully present the theory upon which the conclusions of law and the decree are based, we feel impelled to excerpt the findings rather fully. Substantially they are as follows:
The debtor filed its petition on August 14, 1936. It was approved on August 17, 1936, and the debtor was authorized to remain in possession and operate the business, subject to the court's orders. On October 14, 1936, Keig was appointed trustee in bankruptcy. He qualified and has since acted as such, and was ordered to take possession of all assets and operate the business, which he did. On April 9, 1937, the trustee, by leave of court, filed his petition in the bankruptcy court seeking recovery as before stated.
At the time of filing its petition for reorganization, and for many years prior thereto, the debtor was engaged in manufacturing and selling beer in buildings and with equipment and assets which it owned. Upon the advent of prohibition on June 30, 1919, it conducted the business of manufacturing and selling near-beer, ginger ale, root-beer, malt syrup and the like. Upon the repeal of the Volstead Act, 27 U.S.C.A. § 1 et seq., on April 7, 1933, the debtor ceased manufacturing and selling these beverages and began manufacturing and selling beer in large quantities, having an alcoholic content in excess of one half of one percent in weight. At the advent of prohibition in 1919, there were upward of thirty breweries operating in and about *960 Chicago. On April 7, 1933, there were only five. They were making and selling near-beer, and other kindred products as mentioned above, and the debtor was one of the largest and most prominent and successful of this class.
Prior to 1925, Leo Ernst, father of Hilmar, L. W., Matthew and Malcolm, had been actively in charge of debtor's business, and was president of the company. He became ill about 1925, whereupon Hilmar became president, and L. W. became treasurer and vice-president, and they actively managed the business until June 25, 1934. Leo died in December 1928, after which, and until 1932, about ninety percent of the corporation stock was owned, directly or indirectly, by the four brothers, and ten percent was owned by the widow.
In 1932 the capital stock structure, theretofore consisting of one class, was changed by issuing 100,000 shares of preferred, of no par value, callable at $25 per share, and 150,000 shares of common, of no par value, which was listed and dealt in upon the Chicago Stock Exchange. At that time there was sold to the public, by the Ernst family interests, about one-half of the common stock, from which there was derived approximately $500,000, and the Ernst family interests bought from the debtor about 8,000 shares of the preferred stock, for which they paid into the corporation approximately $150,000. At the same time there was sold to the public about 5,000 shares of preferred stock for approximately $100,000. Through the exchange of the stock formerly held by them, for preferred and common stock, the Ernst family at this time owned, directly or indirectly, about 89 percent of the outstanding preferred stock, and they also owned about 70,000 shares of the total issuable and outstanding common stock. These amounts of the Ernst family interests continued until on and after June 25, 1934. The son, Matthew, died April 29, 1933, and his interest was thereafter owned and controlled by The Northern Trust Company, as trustee under his will.
In anticipation of the repeal of the Volstead Act, the debtor manufactured and had on hand a large quantity of beer having an alcoholic content of about 3.2 percent in weight, which equalled the capacity of its cellars and storage facilities. Upon repeal of the Act the demand for such beer and the debtor's sales were great. It continued production to the limit of its capacity for several months thereafter and at first was able to sell its entire output. During these months, however, many old breweries re-opened and entered business, in and near Chicago; new ones began to manufacture and sell beer; and much beer was shipped in from other places. As a result competition became very keen and the debtor began to have great difficulty in meeting it.
Immediately following the repeal of the Act, about 56 percent of the beer sold was delivered in bottles. The debtor had expected that large quantities would be sold in bottles rather than in kegs and barrels, and had relied on that assumption, which, however, proved to be erroneous, and within a few months the sales by bottles decreased from 56 to 20 percent, and sales by barrel increased correspondingly. Consequently the bottle containers, cases and the like for bottle sales which the debtor had acquired became largely useless. By virtue of the great demand for draught beer it was impossible for the debtor to obtain kegs and barrels in which to transport it. Many contracts for such containers were not fulfilled in the time provided, which occasioned great losses to the debtor. Furthermore, the debtor in its sales met with various forms of propaganda instigated by its competitors to the effect that it was selling near-beer, or that its beer was too green or too young. About this time the debtor decided to do its own delivering instead of using paid distributors which it had theretofore used. This plan caused the many former distributors to disparage by propaganda the quality of debtor's beer.
As a result of this propaganda, beginning in the fall of 1933, the debtor's sales diminished and it began to sustain large losses each month until May 1934. The last dividend paid was on October 1, 1933. The tavern customers of the debtor decreased greatly. To meet competition and the demand of customers for beer with a higher alcoholic content, which could be legally sold after December 5, 1933, the debtor made and sold after that date several different brands of beer. It made great efforts to overcome the propaganda and to increase the number of its tavern keepers and customers by means of advertising and securing salesmen of ability and character. It did actually succeed in increasing the number of tavern keeper customers served in April, May, June and July, 1934, but the business showed no profit except for the month of July.
*961 For a number of years prior to 1933, the debtor had banked with appellant the First National Bank, and at certain periods had borrowed from it various sums which had been paid. In March, 1932, the debtor opened a bank account with appellant, The Harris Trust and Savings Bank, at the solicitation of that bank.
During the period of prohibition it had expended upwards of $1,500,000 in the enlargement and improvement of its plant. In 1932, or shortly thereafter, it used various sums of money derived from the sale of preferred stock, hereinbefore referred to, for enlarging its bottling units and increasing its facilities for delivering bottled beer in larger quantities. About October 23, 1933, it borrowed on its note from Harris $100,000 which was used in its operation of manufacturing beer. The debtor's profits and losses by months from March 1933 to and including July 1934, together with the number of barrels of beer sold, are shown in the margin.[2]
A large part of the losses shown for October and December 1933, and June 1934, included certain bookkeeping adjustments as to inventory, advertising and non-recurring items. Also in June 1933, certain adjustments were made which decreased the earnings for that month. (The character and amount of these items are not disclosed by the findings). Monthly statements of operations were given to Harris for each month after August 1933. In November 1933, it was necessary for the debtor to borrow additional money, and on December 2, 1933, Harris loaned the debtor an additional $25,000, and suggested to the debtor that it secure loans from some other bank, as Harris would not loan the amount probably required by the debtor to carry it into the next beer selling season, and to meet all of its needs. Harris suggested that the debtor contact the First National Bank, with whom for many years it had had banking connections. On or about December 8, 1933, the debtor obtained a loan of $50,000, from the First National on its note, having first advised that bank that it then owed Harris approximately $125,000.
It was later determined by the debtor and the banks that the debtor would probably require an additional amount of $225,000 to carry it into the next beer selling season, which usually begins in April and extends through September. It was agreed by the banks on or about January 1, 1934, that each would extend credit to the debtor, in the sum of $200,000. Pursuant to this arrangement additional loans were made until the debtor owed each bank about $150,000, when, on February 16, 1934, the banks advised the debtor that they would not extend the loans already made, or make further loans unless they were guaranteed by the brothers, Hilmar, L. W. and Malcolm.[3] It had theretofore been agreed that the debtor would carry a deposit balance in each bank in proportion to the amount loaned by each bank. It was also understood when the guaranties were demanded that the banks would cooperate with each other with respect to the loans. The guaranties were executed and delivered, and each bank loaned to the debtor the amount agreed upon, and on April 3, 1934, the debtor owed each bank $200,000.
In the latter part of May 1934, Harris became dissatisfied with the debtor's management, and suggested the employment of one Garnett C. Skinner as manager. Ultimately Skinner was thus employed under a contract dated June 18, 1934.[4] Here the court in its findings remarks: "As to the *962 various transactions and happenings shortly before and in June 1934, there is considerable conflict in the evidence" with respect to the execution of the Skinner contract, and it sets forth its version of both the appellees' and appellants' evidence in relation thereto, after which it sets forth its fact conclusions based upon those recitals, in substance as follows:
The debtor, at the time of entering into the contract with Skinner, owed each bank $200,000, and it owed other persons, firms and corporations, principally trade creditors, a considerable sum. The debts owing to the banks were evidenced by notes, guaranteed by the three Ernst brothers who controlled the debtor. The debtor and guarantors were without funds to pay the indebtedness to the banks and the three brothers understood and had reasonable grounds for believing that if the debtor did not enter into the contract with Skinner, with the approval of its directors, the banks would call the loans and endeavor to enforce their payment against it and its guarantors.[5]
By reason of the circumstances and the *963 relations of the banks to the debtor and to the individuals controlling the stock of the debtor, the banks exercised undue influence by taking advantage of the debtor's necessities and distress to enforce upon it the making of the contract above mentioned whereby the banks succeeded in placing Skinner in control as executive and general manager of all the affairs and business of the debtor, including finances, manufacturing, sales, the employment and discharge of employees, subject only to the control of the two banks, and with his term of control to be subject only to the will of the banks.
The contract resulted in the elimination of the activities of the constituted officers of the debtor, and substituted therefor the will, control and management of the debtor by the banks, through Skinner, and thereupon he entered upon the performance of the contract on or about June 25, 1934, and thereafter until the date of the filing of the petition for relief herein, on August 14, 1936, the banks and each of them exclusively controlled and managed the business and affairs of the debtor through Skinner. The contract remained in full force and effect during the entire period from June 22, 1934, until August 14, 1936, so far as the banks' control and management were concerned.[6]
The court further found that a subsequent contract entered into between the parties *964 on February 15, 1935, to which we have made reference in the margin, was made with the understanding that it should not have the effect of abrogating the then existing contract, but should be subject to the original contract until such time as existing bank loans due the First National and the Harris should be paid.
By reason of the foregoing occurrences and transactions, Skinner became the agent and instrumentality of the banks for the purpose of controlling and managing the business and affairs of the debtor during the period from about June 25, 1934, until the institution of the proceedings herein.
It is contended by appellants that the findings do not support the conclusion that the debtor was unduly influenced by either of them, in procuring the execution of Skinner's first contract. We think this contention must prevail. The relation then existing between the debtor and appellants was solely that of debtor and creditor, and it was not found that at that time there was any fiduciary relation between them. There is no doubt that the debtor was in financial stress and had been for almost a year. Its monthly profits dropped from $207,000 in May 1933, to $31,000 in June; they were $71,000 in July, and dropped to less than $3,000 in August. From that time until Skinner was employed there was a substantial loss each month, and the aggregate loss from August 1933 to June 1934 was almost $415,000. It was during this period, from October 23, 1933, to April 3, 1934, that appellants came to the debtor's rescue at its solicitation and loaned it $400,000. After April and May of 1934, the first two beer-selling months of the year, the debtor was still unable to show a profit, and there was every indication that it would be unable to reduce its indebtedness during that season in any appreciable amount. The court found that at this time the debtor had largely overcome the effect of the vicious propaganda from which it had suffered. A concession of that fact, however, would only substantiate what the profit and loss account indicates, that there was something wrong with the management.
It was under these circumstances that Harris suggested a change of management and recommended that debtor's president should talk to Skinner for the purpose of securing him as manager. The undisputed evidence is that Harris recommended Skinner, or any other fit person agreeable to the Ernsts, and the Ernsts suggested no one, but were reluctant to discharge their old manager who had been with them for many years. There is no finding or claim that either appellant made any threat to induce the execution of the contract. Indeed the court found that no representative of the First National was present at the time it was executed, and that it did not participate therein. The only inducement found by the court to exist for the debtor's execution of the contract was the belief of the Ernst brothers that a refusal would cause the banks to call the loans and to endeavor to enforce payment from the debtor and its guarantors. It is not claimed or found that either bank had made any such threat up to that time, and of course payment could not be enforced on any such note until it became due. Furthermore, section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, was in force eleven days before Skinner's first contract was executed, and the banks as well as the debtor were bound to know that no such threat, if made, could have been carried out had the debtor chosen to rely upon the provisions of that Act. Subsequently, on August 14, 1936, the debtor filed its petition under that Act, but that for the moment is immaterial because we are dealing only with the facts leading up to and existing at the time Skinner's contract was executed, in order to determine whether there was undue influence used in procuring that execution.
Even in the absence of the bankruptcy enactment, and conceding that the debtor had reasonable grounds for its belief, and further conceding without admitting that the banks threatened to do what the debtor believed would be done in case it refused *965 to sign the contract, yet, under the decisions, we think the debtor was not subject to undue influence. Aside from the provisions of the bankruptcy law, a creditor has a right to call a loan when due and to lawfully enforce collection. He may refuse an extension for any cause which may seem proper to him, or even without any cause. The law provides certain means for the enforcement of claims by creditors. The exercise of those rights is not inherently wrongful. See 5 Williston on Contracts (1937 Ed.) sec. 1606.
Of course a threat of ordinary litigation may be made under such circumstances as to render the threat wrongful as a means of coercion, such as where one of the parties is in a position to be easily dominated by the other, or is old and weak-minded. Where, however, ordinary legal procedure is used or threatened by one who believes he has a claim of the kind for which such procedure was provided, there must doubtless be some actual or threatened abuse of process. See Williston, sec. 1607. Here there was no threatened abuse of process, and it was neither alleged nor found that the Ernsts were easily dominated, old, or weak-minded, or in any other analogous situation. Their business experience as disclosed by this record would strongly indicate the contrary. No doubt the debtor, because of its inability to meet its maturing obligations, acquiesced in Harris' recommendations, but this we think is not sufficient to constitute domination of its will. Clearly, the earlier decisions support this conclusion. French v. Shoemaker, 14 Wall. 314, 20 L.Ed. 852; Silliman v. United States, 101 U.S. 465, 25 L. Ed. 987; Hart v. Strong, 183 Ill. 349, 55 N.E. 629; Sargent v. Roberts, 265 Ill. 210, 106 N.E. 805; Morton v. Morris, 8 Cir., 72 F. 392; Andrews v. Connolly, C.C., 145 F. 43; Connolly v. Bouck, 8 Cir., 174 F. 312. The later ones seem to warrant no different conclusion. Campbell v. Freeman, 296 Ill. 536, 130 N.E. 319; Hoelscher v. Hoelscher, 322 Ill. 406, 153 N.E. 662; Gregory v. Gregory, 323 Ill. 380, 154 N.E. 149; Ropacki v. Ropacki, 341 Ill. 301, 173 N.E. 376; Dick v. Marx & Rawolle, 55 App.D.C. 267, 4 F.2d 879; The Adonis, 3 Cir., 38 F.2d 743; McKenzie-Hague Co. v. Carbide & Carbon Chemical Corp., 8 Cir., 73 F.2d 78; 5 Williston on Contracts, sections 1606, 1618, 1625.
In support of a contrary conclusion appellees rely on Bither v. Packard, 115 Me. 306, 98 A. 929; Haydock's Ex'rs v. Haydock, 33 N.J.Eq. 494; Cook v. Wolf, 296 Ill. 27, 129 N.E. 556; Kenny v. Udall, 5 Johns.Ch., N.Y., 464; and other analogous cases. In the Bither Case there was influence acquired and abused, there was confidence reposed and betrayed, as a result of which an uncle took advantage of his young nephew, who lived with him, and obtained an unlawful usurious contract, by virtue of which the uncle collected from the nephew $200 a month for forty-one months. It is clear that these payments were obtained by a fraudulent abuse of confidential relation and by duress, and the court so held. In the Haydock Case the relation was clearly fiduciary. The acts complained of were inherently wrongful. They were perpetrated by a young wife upon her aged husband to secure gifts from him, at a time when he was senile, physically weak, and in a state of extreme dependence when death was imminent. The Cook Case was a suit to set aside a deed that was obtained for a grossly inadequate consideration. It had been procured by the defendant who had been guilty of fraud and usury, and who had taken unconscionable advantage of the ignorant plaintiffs who had relied upon him for advice. It is clear that there were both duress and violation of confidential relationship, and the ruling was in no wise inconsistent with the principles enunciated in the Illinois cases hereinbefore cited. In the Kenny Case the plaintiff's husband, who had married her when she was sixteen years of age, was in jail for debt. Through a friend of the husband, a moneylender furnished the needed money and took a purported assignment of the minor wife's interest in a trust which her father had created for her. The court held the assignment null and void, and by way of dictum, added that, even if the assignment were otherwise valid, such dealing constituted a case which would seem to call for relief to the extent of making the assignment stand as security only for the amount actually paid. On the facts there adduced we can even endorse the dictum, but we think it is not applicable to the facts here presented. We are convinced, therefore, that the debtor was not unduly influenced, or in any manner coerced, to sign the first contract with Skinner. We feel fortified in this conclusion by the further *966 facts that the complainant did not rely upon undue influence, neither bank was a party to the contract, and neither received anything under it.
Appellees contend, however, that the banks did receive under the first contract complete domination of the debtor's plant and business by virtue of that clause which placed Skinner "in complete control of the finances, manufacturing, distribution and management of the * * * Company; with full authority to employ or discharge any and all employees whom he deems necessary for the welfare and success of the * * * Company; being subject only, to the approval of the two banking affiliations * * *" and by this subsequent clause: "This agreement is for an indefinite period and may be terminated upon 30-day notice by either party, but said termination shall be subject to and must have the approval of both * * * (banks) * * *." Hence they urge, regardless of whether there was undue influence in procuring the contract, which also manifested itself in Skinner's management, or whether the acts of the parties were purely voluntary, that complete domination and control having been placed in the banks, it was their duty to manage the business with due care; that for this purpose Skinner became their agent, and they were liable for his acts of mismanagement.
On the other hand, appellants contend that the fair and reasonable construction of the contracts did not place the complete management in the hands of the banks, either directly or by agency, but it merely subjected the contract to their approval and prevented a change of manager without their consent. This seems to have been the construction placed upon the contract by the parties. It was submitted for the banks' approval and they approved it, and after about eight months of Skinner's management the debtor voluntarily entered into another contract with Skinner, without the knowledge or consent of either bank, whereby Skinner was retained as manager for a period of ten years from January 1, 1935. In this contract nothing was made subject to the approval of either bank, and their names were not mentioned. Under those circumstances we think that neither the debtor nor its trustee can be heard to say that Skinner, during any of the time in question, was the agent of the banks in the management of debtor's business. See Casement v. Brown, 148 U.S. 615, 13 S.Ct. 672, 37 L.Ed. 582; Boyd v. Chicago & N. W. Ry. Co., 217 Ill. 332, 339, 75 N.E. 496, 108 Am.St.Rep. 253; Pioneer Fireproof Construction Co. v. Hansen, 176 Ill. 100, 52 N.E. 17.
Moreover, we find no evidence in the record that indicates any effort on the part of the banks to manage any part of the debtor's business after Skinner's employment, except with respect to its financial problems. The amount of their loans to the debtor certainly warranted their activities in this respect. Aside from the alleged undue influence and Skinner's mismanagement which they seek to impute to the banks on the alleged relationship of principal and agent, it is neither alleged, proved, nor found that the banks did any wrongful thing.
At no time under either contract did the debtor or its officers make complaint to either bank of Skinner's conduct, or criticize his management in any manner. On the contrary they spoke of him to them with praise which amounted at times to adulation. In view of their past and current pleasant relations with these banks it would seem that there should have been no reluctance on their part, and clearly it was their duty, to have notified the banks of any act of Skinner's mismanagement, had they considered Skinner as an agent of the banks. At no time did they manifest a desire to discharge him, nor did they ever suggest to either bank that he should be discharged. Even though the debtor's interpretation of the first contract be accepted as correct, that would not appear to be a sufficient cause for the debtor's failure to communicate with the banks with respect to all acts of mismanagement. If the contract, as appellees contend, deprived debtor's board of directors of the control and management of the corporation and clothed the banks with those powers, the debtor was bound to know that such grant of power was in violation of its charter rights under the Illinois Business Corporation Act of 1933, section 33. Smith-Hurd Ill.Ann.St. c. 32, § 157.33. See Bishop v. American Preservers' Co., 157 Ill. 284, 41 N.E. 765, 48 Am.St.Rep. 317. The contract would, therefore, be *967 void ab initio, regardless of whether it was procured by undue influence. If, however, the first contract is to be considered valid, and it is admitted there was undue influence in its procurement then the debtor was bound to know that the contract was not void but voidable and that it might rescind it if it did so promptly after the discovery of the use of undue influence, otherwise the delay in rescinding would be considered as a ratification. Under the circumstances here presented we are of opinion that if Skinner's first contract were induced by undue influence it was ratified by the debtor by its failure to rescind it promptly after the discovery of the influence.
Much criticism has been directed to Skinner's actions in September, 1935, in having the debtor issue its notes to its creditors, secured by a trust deed to the First National Bank. It is undisputed that this was done, with knowledge of the banks, for the purpose of temporarily relieving debtor from the matured and maturing demands of its creditors. Without preference it included every creditor save one objector, whose claim amounted to $1400, and that was paid in order to effectuate the plan. It accomplished precisely what it was intended to do, and it had the endorsement and cooperation of the debtor and all of its officers. However, during the preliminary discussion of the advisability of adopting this method one of the Ernsts had suggested a reorganization under section 77B of the Bankruptcy Act, to which the attorney for Harris replied that the trust deed plan would be less expensive, and would occasion less publicity, and that if it failed to accomplish the desired result a reorganization under that Act would still be available. It is obvious that no one concerned at that time thought that the debtor was insolvent, and all thought that a reasonable respite from debt pressure would solve their problems. There was no evidence, substantial or otherwise, to indicate that the debtor was prevented from securing to itself the benefits of section 77B. Those benefits were available to it at all times after June 7, 1934, and the banks were powerless to prevent it, had the debtor filed its petition under that section.
We think there was error in rendering judgment against appellants for any losses sustained by the debtor by virtue of Skinner's management.
With respect to the payments to the banks which the court characterized as preferences, it is urged by appellees that the court also characterized them as unlawful and fraudulent upon other creditors. The court merely said that the payments were wrongfully caused to be made by Skinner, which payments hindered, delayed and defrauded other creditors. However this may be, we think there was no substantial evidence to support the finding that they were wrongfully made. The evidence is undisputed that these particular loans were made at different times, for different amounts as needed during the preceding winter, evidenced by several unsecured notes maturing in thirty days. The money was used by the debtor to pay pressing obligations such as pay rolls and supplies, and for the purchase of revenue stamps which were required to be placed upon the beer containers before delivery of the beer. These pressing obligations of the debtor were of the same character as those referred to in this trustee's petition in First National Bank v. Prima Co., 7 Cir., 88 F.2d 785, for the payment of which he asked and was granted permission to issue trust certificates, which should be a prior lien on all of debtor's property. This court approved that order. It was clearly understood and agreed by Skinner and the banks that these small loans should be paid during the beer season, in order that the debtor might be in a position to borrow money during the coming winter, if needed.
The money with which these notes were paid was secured by the debtor's pledge of accounts receivable. Hilmar Ernst testified that Skinner told him he was borrowing the money for working capital. Skinner denied having made this statement and testified that he told Hilmar he was borrowing the money in order to keep his promise to the banks to pay the loans which he had made the preceding winter. However, Hilmar said he knew the debtor needed the money, and we perceive no fraudulent intent or purpose manifested by either witness or by any party to the proceeding. Regardless of whether this statement was made to Hilmar, it is undisputed that Skinner had made the promise to the banks in order to protect the debtor's credit as against the less *968 productive fall and winter months, when further credit would be needed to keep the plant running. We think it was sound business practice to make the promise, and equally sound to keep it, if reasonably possible. The fact that a few of the notes were paid before they were due, we think was immaterial and did not constitute fraud. The end of the beer season was rapidly approaching and the main thing required was to protect the debtor's credit for the following fall and winter, and the fact that a part of the debts were anticipated and paid a short time before they were due would only tend to strengthen the credit. That such credit was necessary during the next fall for precisely the same character of debts is clearly substantiated by the proceedings in First National Bank v. Prima Company, supra. This court approved those proceedings and gave the obligations thereby created priority over the mortgage, because they were necessary to keep the business running in order to more fully protect all the creditors, as well as the debtor.
It is further contended by appellees that the payment of these notes was based partly on the promises of the banks that they would extend further credit when needed and requested. A complete answer to this contention is that the debtor never afterwards asked for credit of either bank, but on August 14, 1936, filed its petition for relief under section 77B.
We are convinced from the evidence and the findings that appellees were not entitled to recover as to these items under section 67e of the Bankruptcy Act, because (1) there was no adjudication of bankruptcy; (2) there was no proof of any intent or purpose on the part of the debtor, or of Skinner, to hinder, delay or defraud the debtor's creditors; and (3) the court did not find that any of those facts existed. We are further convinced that appellees were not entitled to recover under section 70e, because no facts were proved or found upon which any creditor might have voided the payments, and the banks were bona fide holders for value of the money they received.
Other questions are presented which, in view of our rulings, are not necessary to decide.
The decree is reversed as to each appellant.
NOTES
[1] "[Section 77A] § 206. In addition to the jurisdiction exercised in voluntary and involuntary proceedings to adjudge persons bankrupt, courts of bankruptcy shall exercise original jurisdiction in proceedings for the relief of debtors, as provided in Section 77B of this Act [section 207 of this chapter].

"[Section 77B] § 207. (a) * * * Upon the filing of such a petition or answer the judge shall enter an order either approving it * * * or dismissing it. If the petition or answer is so approved, an order of adjudication in bankruptcy shall not be entered and the court in which such order approving the petition or answer is entered shall, during the pendency of the proceedings under this section, have exclusive jurisdiction of the debtor and its property wherever located for the purposes of this section, and shall have and may exercise all the powers, not inconsistent with this section, which a Federal court would have had it appointed a receiver in equity of the property of the debtor by reason of its inability to pay its debts as they mature."
Subsequent language of this section provides that a corporation owned or controlled, through an intervening medium, by a petitioning debtor may file a petition for reorganization in connection with or as a part of the plan of reorganization of the petitioning debtor and "thereupon such court, if it approves such petition, shall have the same jurisdiction with respect to such corporation, its property, and its creditors and stockholders as the court has with respect to such other debtor." (Our italics). 11 U.S.C.A. §§ 206, 207.
[2] 1933 Profit Loss Barrels
 April .......... $366,168.85 43,662
 May ............ 207,645.14 32,963
 June ........... 30,868.98 34,957
 July ............ 71,138.90 26,191
 August .......... 2,896.40 19,460
 September ....... 1,277.18 15,875
 October ......... 128,558.31 9,235
 November ........ 68,643.05 6,125
 December ........ 75,064.28 9,277
 1934
 January ......... 37,603.11 6,872
 February ........ 37,580.69 5,905
 March ........... 39,181.22 8,711
 April ........... 26,312.04 9,894
 May ............. 544.79 15,177
 June ............ 168,073.66 19,717
 July ............ 25,031.08 20,212

[3] This was first suggested by the First National Bank, which in its prior dealings with the debtor had always required such guaranties.
[4] of Agreement.
This agreement, entered into this 18th day of June, 1934, by and between the Prima Company and Garnett C. Skinner whereby the Prima Company agrees to employ Garnett C. Skinner in the capacity of Chief Executive and General Manager under the following terms and conditions:
Garnett C. Skinner is to be placed in complete control of the finances, manufacturing, distribution and management of the Prima Company; with full authority to employ or discharge any and all employees whom he deems necessary for the welfare and success of the Prima Company; being subject only, to the approval of the two banking affiliations, namely  The Harris Trust and Savings Bank and the First National Bank of Chicago, Illinois.
It is further agreed that Garnett C. Skinner is to become a co-signer of all checks issued by the Prima Company.
Garnett C. Skinner is to receive as compensation for his services, $300.00 weekly, payable each and every week; in addition thereto, Garnett C. Skinner is to receive at the end of each fiscal year of the Prima Company a percentage of the net profits as shown by the certified yearly audit on the following basis: 
2½% of all net profits less than $100,000 yearly.
3½% of all net profits over $100,000 and less than $200,000.
4% of all net profits over $200,000 and less than $300,000.
5% of all net profits over $300,000 yearly.
It is agreed that the net profits shall be computed from the first day of January to the 31st day of December each year.
Further, in consideration of Garnett C. Skinner's signing of this contract, the Prima Company, jointly with Hilmar F. Ernst, Malcolm Ernst and L. Wainwright Ernst, agree to set aside in trust or in person, 10,000 shares of the Prima Company, no par, common stock, which stock may be purchased at the option of Garnett C. Skinner at the present market value of $8.00 per share, at any time on or before July 1st, 1935.
This agreement is for an indefinite period and may be terminated upon 30-day notice by either party, but said termination shall be subject to and must have the approval of both the Harris Trust and Savings Bank and the First National Bank of Chicago, Illinois.
Should this contract be terminated by the Prima Company or by direction of the banks above named, before the expiration of one year of employment to Garnett C. Skinner, then Garnett C. Skinner shall be entitled to receive full compensation for the period of one year from July 1, 1934 up to and including June 30, 1935.
In addition thereto, Garnett C. Skinner shall receive the percentage of net profits based upon the schedule above listed due him at the end of the fiscal year, with the understanding and agreement that Garnett C. Skinner is to receive commission only in proportion to the yearly average earnings for the specific period of his employment, which is to say, that should this working agreement be terminated within five months after the beginning of the fiscal year, Garnett C. Skinner would then be entitled to only five-twelfths of the net earnings of the company as computed at the end of the fiscal year.
In the event of a termination of this agreement before the expiration of a one year period, the full year's salary shall become due and payable at the termination of this agreement.
No additional terms or conditions, except those specified herein and authenticated by the signature of all parties will be recognized as a part of this agreement.
This agreement signed at Chicago, Illinois, this ____ day of June, 1934.
 The Prima Company,
 By H. F. Ernst,
 President.
 L. W. Ernst,
 Vice-President-Treasurer.
 A. J. Renn,
 Secretary.
 Malcolm Ernst,
 Asst. Secretary.
 Frank P. Van De Westelaken.
Accepted by:
 G. C. Skinner.

[5] The record does not disclose that any representative of either bank ever said that they would not extend the loan if Skinner were not employed, or if he left, unless Skinner must be considered as such representative. There was evidence that Skinner said, outside the presence of any representative of either bank, that the banks would not extend the loans if he left. However, he denied having said this in fact or substance.
[6] However, on February 15, 1935, the debtor and Skinner, without the knowledge or consent of either appellant, entered into the following contract whereby it secured the service of Skinner as its manager for ten years beginning January 1, 1935:

"This Agreement, made and entered into as of the 15th day of February, 1935, by and between Prima Company, a corporation of the State of Illinois (hereinafter referred to as `the Company') and G. C. Skinner of Chicago, Illinois (hereinafter referred to as `the manager') Witnesseth:
"Whereas, the Company is desirous of securing the services of the manager for a period of years in the capacity of General Manager of the business and properties of the Company, and
"Whereas, the manager is willing to enter into a contract on the conditions hereinafter set forth for a period of ten (10) years from January 1, 1935;
"Now, therefore, the parties hereto do hereby agree as follows:
"The Manager Agrees:
"1. That he will accept employment as General Manager of the affairs and business of the Company for a period of ten (10) years from the 1st day of January, 1935;
"2. That he will honestly and conscientiously devote his entire time and energy to the affairs and business of the Company in an effort to develop its products, expand its business and merchandise its output;
"3. That he will, if so requested, become a member of the Board of Directors of said Company and advise and counsel with the other officers to the end that the Company may avail as completely as possible of his ability and ingenuity.
The Company Agrees:
"1. To compensate the manager for his services on the following basis:
"(a) By the payment of Three Hundred Dollars ($300) per week in cash, payable weekly;
"(b) By paying to the manager at the end of each fiscal year of the Company, a percentage of net profits as shown by an annual audit to be made by certified public accountants satisfactory to the manager:
"(1) 2½% of the first $100,000 of net profits of the Company in any fiscal year;
"(2) 3½% of the second $100,000 of net profits of the Company in any fiscal year;
"(3) 4% of the third $100,000 of net profits of the Company in any fiscal year;
"(4) 5% of all net profits of the Company in excess of $300,000 in any fiscal year.
"It is understood and agreed that such net profits shall be computed from the 1st day of January to the 31st day of December of each calendar year.
"This Agreement may be cancelled and terminated by either party by service upon the other of notice of intention to so terminate, which notice shall be served by depositing same in the United States Mail, postage prepaid, to either party at the principal office of the Company, and this agreement shall thereby terminate six (6) calendar months from the date of receipt of such notice. In the event, however, of the termination of this Agreement by the Company, the manager shall be entitled to receive one full year's compensation at the rate of three hundred dollars ($300) per week.
"In witness whereof, this Agreement has been executed on behalf of the Company by its proper officers, duly authorized by its Board of Directors, and by the manager, all as of the day and year first above written.
 "Prima Company,
 By H. F. Ernst,
 President.
 G. C. Skinner (Seal)"
"Attest:
 "A. J. Renn,
 "Secretary." (Seal)